Bobby Ray ADKINS, Petitioner,

v.

T.C. MARTIN, Warden, et al., Respondents.

No. CIV–88–855–P.

United States District Court, W.D. Oklahoma.

Aug. 16, 1988.

Bobby Ray Adkins, Federal Correctional Institution, El Reno, Okl., for petitioner.

William S. Price, U.S. Atty., Vicki Zemp Behenna, Asst. U.S. Atty., Oklahoma City, Okl., for respondents.

OPINION AND ORDER

PHILLIPS, District Judge.

The Petitioner is an inmate of the Federal Correctional Institution, El Reno, Oklahoma, which is located within the territorial boundaries of the Western District of Oklahoma. He has been permitted to file a Petition for Writ of Habeas Corpus under 28 U.S.C. Section 2241 in forma pauperis, urging the following grounds in support of the Petition:

Ground One: Medical Problem is causing Petitioner to show FALSE positive in urine test for drugs.

Ground Two: Institutional collection of urine samples are (sic) inadequate.

Ground Three: Institutional handling of collected urine samples are inadequate.

Ground Four: Testing Laboratory is not a valid testing Institute. The procedures used in testing are not adequate.

Ground Five: Incident reports by Institution have Policies to follow.

The parties have submitted memoranda in support of their respective positions and the Respondents have filed a Motion to Dismiss the Petitioner's Petition for a Writ of Habeas Corpus. In consideration of these submissions the Court finds and concludes as follows:

## I

Since the Petition for Writ of Habeas Corpus raises issues involving the execution of the Petitioner's sentence and the current custodian has been named as a Respondent, the Court finds that it has jurisdiction of the subject matter of this action. 28 U.S.C. Sections 2241, 2242; *Benites v. United States Parole Commission*, 595 F.2d 518, 520, n. 1 (9th Cir.1979).

## II

■ The Petitioner challenges the institutional urinalysis testing program that has detected his use of contraband drugs. The positive test results precipitated discipline of the Petitioner as the result of two offenses while incarcerated at the Federal Correctional, Butner, North Carolina and two offenses while incarcerated at the Federal Correctional Institution, El Reno, Oklahoma. The records of the Federal Bureau of Prisons clearly reflect that the Petitioner did not exhaust administrative remedies concerning the disciplinary actions based on offenses reported April 6, 1985 and April 17, 1986 at the Federal Correctional Institution, Butner, North Carolina or on December 31, 1986 at the Federal Correctional Institution in El Reno, Oklahoma. However, on May 25, 1987 the Petitioner submitted a urine sample that tested positive for morphine as reflected in a test report received from PharmChem Laboratories, Inc., Menlo Park, California on June 4, 1987. PharmChem Laboratories is the contractually authorized facility for testing of urine samples for illicit drugs.

In accordance with the Urine Surveillance Program and Inmate Disciplinary Procedures, the staff at the Federal Correctional Institution, El Reno, Oklahoma conducted committee hearings on the offense [Use of Narcotics (Morphine) ] based on the test results reported on June 4, 1987 and the Petitioner was disciplined through the forfeiture of good time and placed in temporary disciplinary segregation. 28 C.F.R. Sections 550.30 et seq., 541.10 et seq. This decision was appealed in accordance with 28 C.F.R. Section 542.10–542.16 through the Regional Director, Bureau of Prisons to the General Counsel for the Federal Bureau of Prisons. Therefore, the administrative remedy procedure was exhausted only as to the June 4, 1987 offense.

Petitioners must ordinarily exhaust administrative grievance procedures before raising treatment, control, management, or condition of confinement issues in federal court in the absence of clear abuse or caprice. The exhaustion of remedies is a salutary prerequisite to judicial consideration of the extraordinary writ of habeas corpus and the administrative procedures assist the Court by developing a factual record, permit the application of corrections expertise to the claims of the prisoner, and possibly resolve the claim which would limit or eliminate the Court's interference in the operation of the institution. 18 U.S.C. Section 4001; *McCart v. United States*, 395 U.S. 185, 193–195, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1963); *Williams v. O'Brian*, 792 F.2d 986 (10th Cir.1986). It is the Court's opinion that the Petitioner has not utilized administrative remedies applicable to the offense reports dated April 6th, April 17th, and May 25th, that he has not shown good cause for his failure to avail himself of these remedies, and, accordingly, all allegations relating to the improper collection and testing procedures as to those offenses are foreclosed from consideration, pending exhaustion of any available remedies. *United States ex rel. Sanders v. Arnold*, 535 F.2d 848, 850–851 (3rd Cir.1976). However, insofar as the generalized contentions pertain to the June 4, 1987 offense, they are hereinafter reviewed.

## III

■ The institutional offense that is properly before the Court had its inception on May 25, 1987 at 8:30 p.m. when an officer took urine sample number 7281 from the Petitioner. The incident report form reflects that the Petitioner was assigned to Colorado One Unit, and it originally showed that the sample was taken in this unit. However, this was corrected to show that the sample was actually taken in the compound lieutenant's office as alleged

by the Petitioner. This correction in the report was made by the Warden at the first stage of the administrative remedy review process and the Warden's statement also explains the necessity for the blank labels being attached to the specimen bottles in advance, although the specimen numbers are recorded on the bottle in the inmate's presence. This specimen was returned from PharmChem Laboratories on June 4, 1987 and the test analysis indicates positive for morphine for specimen number 7281 and this specimen is further identified as that of the Petitioner.

On June 4, 1987 the Petitioner was advised of his rights, and stated that he was having kidney problems which required the taking of medication that was giving the false reading of the test. Further, the Petitioner expressly declined the right to call witnesses at the Institutional Discipline Committee Hearing (IDC) on June 4, 1987, and the hospital staff was contacted regarding the Petitioner's kidney problems. The report states that medical records listed no prescription drugs during the month of May and the records show the inmate to be manipulative and that he refused to take prescribed pain medication that does not contain narcotics. (Exhibit 4, Brief in Support of Respondents' Motion to Dismiss). The institutional supplement to the Bureau of Prisons Policy Statement number SW 6060–12, dated February 24, 1986, subject: Urine Surveillance to Detect and Deter Illegal Drug Use, states that the paste-on label for specimen identification should be glued on the bottle in the presence of the inmate prior to being brought to the reporting official. (Paragraph 6 D, p. 42, Petitioner's Brief in Support of Habeas Corpus Petition).

For the most part, the statements in support of the Petitioner's claims concern procedures while incarcerated at the Federal Correctional Institution, Butner, North Carolina and illicit drugs other than Morphine (e.g., THC). The Petitioner's allegations of improper or unreliable testing procedures are generalized and speculative conclusions that do not show errors or possibility of errors in the collection and safeguarding of the specimen resulting in the

June 4, 1987 incident report. However, Petitioner has shown that the specimen was taken in the compound lieutenant's office rather than the Colorado One Unit which is a de minimis error on the report form.

The evidentiary material include affidavits submitted by chemists and toxicologists employed at PharmChem Laboratory and an undated and unsigned report reportedly submitted by a Dr. James Woodford of unknown credentials that was included in materials submitted by the Petitioner. The Director of Toxicology for PharmChem Laboratories, Joyce Y. Chang, recites outstanding curriculum vitae and outlines the accepted methodologies for drug detection in current use including thin layer chromatography, enzyme immunoassay, and gas chromatography. This affidavit further states as follows:

13. PharmChem's standard procedure for testing urine specimens submitted by the U.S. Bureau of Prisons (BOP) for cocaine metabolite and morphine utilizes the three methodologies described above (TLC, EIA and GC). Each specimen is then retested by GC.

14. PharmChem will *not* report a urine specimen to the BOP as being as "positive" without a confirmation of the TLC and/or EIA result by GC. In other words, if PharmChem certifies a urine specimen as "positive" for cocaine metabolite, or morphine, it is only when we have ascertained each result by at least two separate and independent tests, each using a different and scientifically accepted methodology. This double testing procedure has two inherent safeguards against a false "positive" report: (a) the specimen container is independently sampled and label checked twice, thus eliminating the possibility of an incorrect selection or assignment of the specimen; and (b) with at least two separate procedures, there is virtually no possibility that the "positive" result could be produced by an interfering substance in the urine.

(Exhibit 7, p. 6; Brief in Support of Respondents' Motion to Dismiss).

## IV

In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court established that imposition of inmate discipline requires that the prisoner be given an opportunity to appear before the decision making body, that he receive written notice of the charge against him in advance of the hearing, conditional opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the decision. The Court opined that broad discretion is accorded to the prison officials with limited judicial review of institutional due process to determine if their decision is arbitrary or capricious. 18 U.S.C. Section 4161 (repealed Pub.L. 98–473, Title II, Section 218(a)(4), October 12, 1984, 98 Stat. 2027) statutorily establishes the right to good time credits and a deprivation of that right is a deprivation of liberty that must comport with due process requirements of the Constitution. *Brown v. Smith*, 828 F.2d 1493, 1495 (10th Cir. 1987). In *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), the Supreme Court recognized a protected liberty interest for a state prisoner to remain in the general institutional population rather than disciplinary segregation. *Also see* 28 C.F.R. Section 541.20.

The possibility of "false positive" indication of illicit drugs is an important evidentiary consideration in the imposition of disciplinary sanctions against inmates. Urinalysis testing is an accepted means of detecting and deterring the use of contraband drugs and in this regard, the prison security needs have overridden to some extent the prisoners expectation of privacy by random urine collection and analysis. Thus, the legal analysis basically involves balancing the significant legitimate security interests of the institution against the privacy interests of the inmates within the complexities of the prison environment. *Bell v. Wolfish*, 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447 (1979); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

 The immunoassay technique for analysis of illicit substances in body fluid has been scientifically recognized as a means of assisting in the control and management of behavior in the volatile structure of an institutional setting. It has been authoritatively determined that the immunoassay test is 95 per cent accurate, it is the most widely used and reliable method of laboratory medicine in the world, and forms a sufficient basis for disciplinary action that does not violate due process. It is sufficiently reliable even if it is the only evidence in a parole revocation hearing. The Court also noted as follows:

> Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, the margin of error is insignificant in light of institutional goals. States need not implement all possible procedural safeguards against erroneous deprivation of liberty when utilizing results of scientific testing devices in accusatory proceedings.

*Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir.1986).

In *Peranzo v. Coughlin*, 675 F.Supp. 102 (S.D.N.Y.1987), the Court found the immunoassay test reliable since there were very few false positives that could have been produced by cross-reactivity such as from Actifed, Motrin, or poppy seeds. The Court concluded that the 98 per cent plus or minus rate of accuracy of the double testing procedure is sufficiently reliable so that use of the results as evidence in disciplinary hearings does not offend due process.

PharmChem Laboratory uses the enzyme immunoassay method which is identified in its proprietary form as EMIT–d.a.u. assays produced by Syva Company of Palo Alto, California. Double testing of the specimens is also conducted by PharmChem Laboratory utilizing the immunoassay and other methodologies and it is the Court's belief and opinion that testing procedures by this contract facility including the utilization of two separate and independent tests each having a different scientifically accepted methodology, eliminates for constitutional purposes any cross-reactivity or false positives as a result of kidney ailments or medication for these ailments.

The verity of the evidence adduced in this record was also judicially established in *Frankenberry v. Williams*, 677 F.Supp. 793 (M.D.Pa.1988). There the Court found no genuine issue of fact as to the reliability of the tests results of PharmChem Laboratories based, in part, on the statements of Joyce Chang, Director of Toxicology for PharmChem Laboratories as a result of the "EMIT–d.a.u." test which is verified by a second test, the "high performance thin layer chromatography" test. In making this finding the Court rejected the Plaintiff's commonly presented argument that the positive result was due to cross-reactivity based on opinions of the validity of the drug testing, an article published by the National Organization for Reform of Marijuana Laws, part of a Bureau of Prisons' Program Statement concerning drug testing procedure, and that Plaintiff had received an anesthetic and Tylenol with codeine the day before submitting the specimen.

■ The constitutionality of drug surveillance by urinalysis has been analyzed under recognized authorities in light of the imperative need for such testing in the institutional environment, and due process has been accorded the Petitioner by the prison discipline proceeding from evidence presented in this record. *McKinney v. Meese*, 831 F.2d 728, 733 (7th Cir.1987). It is the Court's opinion that the evidence meets the substantial evidence standard which is more than a scintilla and is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Henderson v. Carlson*, 812 F.2d 874, 879 (3rd Cir.1987); *cf. McKinney v. Meese, supra.* An inmate with a drug dependency should be treated and/or administratively disciplined to facilitate his hopefully successful transition to free society. The Petitioner's showing of constitutional deprivations is unsubstantial and consists of conclusory hearsay assertions without supporting factual allegations. *Cotner v. Hopkins*, 795 F.2d 900, 902 (10th Cir.1986).

## V

Further, under Local Court Rule 14(A), the Petitioner was required to file a Response within 15 days from June 16, 1988, as extended to July 28, 1988, or the Motion to Dismiss would be deemed confessed. The Petitioner has not complied with this Rule and Order and the Court is, therefore, compelled to Dismiss the Petition because of procedural default. *In re Baker*, 744 F.2d 1438 (10th Cir.1984).

Accordingly, judgment will issue dismissing the Petition for a Writ of Habeas and the claims asserted therein.