

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0056-11

### AARON SOMERS, Appellant

### v.

### THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE TENTH COURT OF APPEALS
## BRAZOS COUNTY

KELLER, P.J., delivered the opinion of the Court in which PRICE, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. COCHRAN, J., filed a concurring opinion in which HERVEY, J., joined. MEYERS, J., filed a dissenting opinion. JOHNSON, J., filed a dissenting opinion. WOMACK, J., dissented.

## O P I N I O N

The present case involves the admissibility of scientific evidence under Texas Rule of Evidence 702 and *Kelly v. State*.[1] We granted review to determine whether the Court of Appeals

---

[1] 824 S.W.2d 568 (Tex. Crim. App. 1992).

erred in holding that EMIT drug test results are not reliable without a confirmation test.[2]  We hold that the Court of Appeals did err.  We hold that EMIT tests are reliable under the first two prongs of *Kelly*.[3]

### I. BACKGROUND

### A. Relevant Facts

At 11:45 p.m. on October 20, 2007, police responded to a noise complaint at a fraternity house party.  Appellant, the social chairman for the fraternity, informed the officers that he was in charge and that any further complaints could be directed to him.  Police determined that appellant was slightly intoxicated but did not detain or question him.  Police returned to the fraternity house at 2:00 a.m., again in response to a noise complaint.  At that time, appellant agreed to shut down the band.  The police found appellant to be more intoxicated than at the previous encounter.  Police returned at 2:30 a.m. to end the party but did not see or speak to appellant at that time.

A police officer who had responded to the noise complaint was called to the scene of a major accident at 3:24 a.m.  The officer arrived at the scene and saw an overturned pickup truck in the road and a second vehicle in the grass on the side of the road.  The second vehicle was approximately six inches into the roadway over the fog line; the ignition, headlights, and hazard lights were on; and the vehicle was in drive.  The officer recognized appellant at the scene.  Based upon witnesses and evidence at the scene, the officer believed appellant was driving the pickup at the time of the

---

[2] The specific ground upon which the petition was granted is: Did the Court of Appeals err in holding that EMIT test results are not reliable without a confirmation test and therefore deny appellant his constitutional right to present a defense? Appellant presented two other grounds that we refused.

[3] Given our disposition, we need not address whether appellant's constitutional right to present a defense has been impaired.

accident. The officer performed field sobriety tests on appellant and then placed him under arrest for driving while intoxicated.

The victim, Michelle Briggs, was the sole occupant of the vehicle struck by appellant's pickup. When Briggs was found at the site of the collision, she had no signs of life and was believed to be dead. Although she had no obvious head or neck injuries, she had no pulse, she was not breathing, and her eyes were rolled back in her head. First responders extracted Briggs from her vehicle and administered CPR. Electrodes were attached to Briggs and revealed that she was in pulseless electrical activity and that blood was not getting oxygen to her brain or body. She was taken by ambulance to the hospital where her brain activity was found to be consistent with that of a deceased person.

Samples of Briggs's blood were drawn at the hospital on the date of the collision, October 21, 2007, and submitted to the Texas Department of Public Safety (DPS) on October 25, 2007. No preservatives were added to the blood samples. Over the course of her hospitalization, Briggs lost what little brain function she previously had, and on October 27, 2007, she was taken off of life support and pronounced dead.

On November 20, 2007, approximately one month after the collision, the DPS crime lab performed a drug analysis of Briggs's blood using an enzyme-multiplied immunoassay technique (EMIT). DPS tested Briggs's blood for six different classes of drugs: amphetamines, barbiturates, benzodiazepines, cocaine and its metabolites, opiates, and phencyclidine. The results were positive for both cocaine and amphetamines. Approximately one year after the EMIT test was performed, DPS conducted gas chromatograph/mass spectrometer (GC/MS) tests on the sample of Briggs's

blood to confirm the results of the EMIT test.[4]  The GC/MS test results were positive for amphetamines, but showed only trace amounts of cocaine.  The trace amounts of cocaine were below the minimum levels required by DPS protocol before the results could be reported as "positive" for cocaine.  Based on the results of the EMIT and GC/MS tests, and in accordance with internal protocol, DPS issued a final toxicology report on March 9, 2009, reflecting that Briggs's blood was positive only for amphetamines.

Meanwhile, appellant was charged with intoxication manslaughter.  The State's theory of prosecution was that appellant became intoxicated at the fraternity party and later drove the pickup that collided with Briggs's vehicle, thereby causing her death.  Appellant's primary defensive theory was that Briggs was on drugs and had likely died of a heart attack before the vehicles collided, and appellant was therefore not criminally responsible for her death.  To support this theory, appellant planned to submit the results of a drug test performed on Briggs's blood after the collision.  However, the State filed a pre-trial motion in limine seeking to limit "[a]ny direct or indirect reference to drug consumption by, impairment of, or intoxication of [Briggs] specifically but not limited to amphetamine."

### B. Rule 702 Hearing

On August 25, 2009, the trial court held a Rule 702 hearing outside the presence of the jury to consider the admissibility of the EMIT test results.[5]  Defense counsel cited two reasons for

---

[4] The GC/MS confirmation test for cocaine and its metabolites was performed on October 23, 2008, and the GC/MS confirmation test for amphetamine, methamphetamine and amines was performed on February 26, 2009.

[5] The trial court considered the admissibility of additional evidence of Briggs's drug use at this hearing, namely, statements Briggs had made at work when confronted with a positive drug test

(continued...)

admitting the evidence: (1) to show Briggs's cause of death; and (2) to make the jury understand why it was likely that Briggs had parked partially on the roadway. Appellant sought to meet his burden of showing reliability by offering expert testimony, scientific articles, and published judicial opinions from other jurisdictions.

## 1. *Expert Testimony*

Appellant offered testimony of three experts from DPS who had performed the EMIT and GC/MS tests on Briggs's blood. These experts testified as to their qualifications and experience, the drug test procedures, and their knowledge of the general accuracy and reliability of EMIT test results. The first witness to testify was Megan Barton, the DPS employee who conducted the EMIT test on Briggs's blood approximately one month after the blood had been drawn. Barton testified that she earned a bachelor of science degree from the University of Texas, had completed in-house training at DPS, and has performed thousands of analyses throughout her career. Barton described the scientific theory underlying the EMIT test and how it is performed:

> There are two parts to it. You have an antigen and an antibody. The antigen, it is made to react with the drug – class of drugs in question. When the two are added together, there is a bond between the antibody and the antigen, and that will produce a color change.

> [A sample of blood] is placed with the instrument and run with these specific

---

(...continued)
for cocaine, amphetamines, and methamphetamine three days before the accident, and crack cocaine pipes found in Briggs's purse at the scene of the accident. This additional evidence was excluded by the trial court, and the Court of Appeals upheld the exclusion. As this Court has granted review on reliability of the EMIT test results alone, we will not address the additional evidence.

The parties and the trial court also engaged in a discussion about the relevance of the EMIT test results, and appellant offered some testimony on the matter. The trial court ruling excluding the EMIT test results was based, at least in part, on a conclusion that there was no nexus between the test results and the victim's death. The Court of Appeals's opinion did not address this basis for excluding the test results, so neither do we.

reagents I talked about that have the antibodies and antigens. It will give us a result of positive or negative within those classes of drugs.

Barton testified that the underlying scientific theory of the EMIT machine is valid and that she applied the technique correctly. She testified that she tested Briggs's blood for six different classes of drugs, and that the results indicated a possible positive for benzoylecgonine, or "cocaine and its metabolites," and a possible positive for amphetamines. EMIT test results fall into four levels of increasing concentration: 0.1 to 0.3; 0.3 to 1.0; 1.0 to 3.0, and above 3. Barton testified that the EMIT test results for cocaine in Briggs's blood were in the third highest level, i.e., 1.0 to 3.0.

Barton testified that DPS has a heavy caseload and that the EMIT test is used as a reliable initial screening test. She testified that under DPS protocol, when EMIT test results are positive for a class of drugs, only then is the more accurate and more expensive GC/MS test performed to confirm"what specific drug we're talking about." Barton agreed that the manufacturer of EMIT recommends further testing to confirm the presence of the drugs and that with an EMIT test alone she could not determine how or when an individual ingested cocaine or how many times.

Barton testified that the EMIT test is widely used and that, from both her own personal dealings and the literature, she has found it to be a reliable screening test. She testified that, out of the thousands of EMIT tests throughout her career at DPS, she had never personally encountered a false positive. Barton had heard of only one or two false positives out of thousands, but she pointed out "that is hearsay from other analysts; not me personally." Barton testified that the negative GC/MS test for cocaine in Briggs's case would not be indicative of a false positive, but instead, would be indicative of how Briggs's blood sample was preserved. She explained that cocaine is unstable and breaks down quickly and that, to her knowledge, Briggs's blood sample did not contain the preservative that is normally used.

Appellant's second witness to testify was Renae Hawkins, a forensic scientist with the DPS laboratory who performed the GC/MS test on Briggs's blood for cocaine almost one full year after Briggs's blood had been drawn. Hawkins testified that she earned a bachelors degree in chemistry from the University of Texas and was a trained toxicologist. Hawkins explained the underlying scientific principles of the EMIT test and how it is performed:

> [EMIT] stands for enzyme-multiplied immunoassay technique. Basically the scientific principles behind it are, it tests for six classes of drugs, and it is based on the relationship between an antigen and an antibody, the drug in the blood being the antigen.
>
> And then we add the antibody to the samples, and if there is a relationship or reaction, that reaction is measured to let us know that that drug is in the sample.

She then explained that when the antibody reacts with the antigens in the blood, this "reaction" is made apparent by a "change of absorbance" or "color change," which is then measured to determine the basic concentration of the drugs in the blood.

Hawkins testified that she found the EMIT test to be "a reliable presumptive test before I confirm." When asked about the reliability of EMIT tests for determining the existence of cocaine specifically, Hawkins clarified that cocaine breaks down quickly in the body and metabolizes into benzoylecgonine, and that EMIT actually tests for the existence of benzoylecgonine, not cocaine. Hawkins then agreed that EMIT is a reliable presumptive test to determine whether cocaine has been ingested, stating: "It is a reliable test before the [GC/MS] confirmation to determine which analites [are present in the blood] and in what concentration."

Hawkins testified that she has conducted hundreds of GC/MS tests on blood samples following positive EMIT tests for cocaine, and that out of the hundreds, Briggs's is the only one that

has come out negative.[6]  When asked whether she had an opinion as to why the GC/MS test was negative for cocaine in this case, Hawkins responded: "Cocaine and its metabolites have stability issues that can degrade in the blood tube itself outside the human body.  In this particular case, there was not the usual preservative that is in a sample that we test."

Hawkins testified that the EMIT test is considered a reliable presumptive screen by the forensic toxicology community in Texas and that the manufacturers designed EMIT as a screening device and recommend confirmation tests to determine specific analite values.  She agreed that the results of an EMIT test alone would not indicate how or when an individual ingested cocaine, how much was taken, or whether the individual was a habitual user, but she pointed out that the results of a GC/MS test would not indicate these facts either.  Hawkins agreed that EMIT is a very good initial screening test to give an approximation as to whether or not somebody has ingested cocaine and that it is comparable to HGN being a good initial screening test to determine whether somebody is intoxicated.

Appellant's third witness was Kathy Erwin, the forensic scientist at the DPS crime laboratory who performed the GC/MS test on Briggs's blood for amphetamine and methamphetamine over one year after Briggs's blood had been drawn.  Erwin testified that she attended Texas Women's University where she earned a bachelor of science degree in chemistry with a minor in biology, as well as a master of science in chemistry with an emphasis on analytical chemistry.  She further testified that she had completed postgraduate courses in forensic toxicology at the University of

---

[6] Hawkins clarified that out of hundreds of tests, this was the first and only time she had seen "no analite at all."  However the record shows that the GC/MS test did show trace amounts of cocaine, but below the minimum levels required by DPS protocol before the results could be reported as positive.

Florida and had recently been certified as a forensic toxicology specialist by the American Board of Forensic Toxicology. Erwin had been employed by DPS for ten years.

The focus of Erwin's testimony was the connection between ingesting cocaine and amphetamines and suffering heart failure. However she also testified as to the reliability of EMIT testing. Erwin testified that she was familiar with EMIT, and she explained the scientific basis of the test:

> It is a screening test, and it is based on enzyme reactions. It is kind of – its called an enzyme immunoassay test. What it does is, you have reagents that react with a specific class of drugs. It's kind of like a lock-and-key mechanism. A particular set of reagents will react only with a particular class of drugs, kind of like a lock and key.

Erwin testified that the EMIT test is a reliable device for determining whether there are drugs or chemicals in a person's body. She agreed that EMIT was designed as a screening device and that, under manufacturer recommendations and DPS protocol, positive EMIT tests were followed by a confirmation test before final results were reported.

## 2. *Scientific Literature*

Appellant offered two articles discussing the scientific principle underlying EMIT and the value of EMIT testing as an initial screening procedure. In one of the articles, authors Lu and Taylor state that "drug screening through urinalysis is a widely accepted tool for rapid detection of potential drug use at a relatively low cost" and a "potentially useful method for detecting and monitoring drug use in a variety of contexts, including the criminal justice system."[7] They evaluated the sensitivity and specificity of EMIT II, finding that the test generated "fairly consistent results" for several drugs,

---

[7] Natalie Lu & Bruce Taylor, *Drug screening and confirmation by GC-MS: Comparison of EMIT II and Online KIMS against 10 drugs between US and England laboratories*, 157 FORENSIC SCI. INT. 106 (March 2006) (abstract).

including cocaine.[8]

In the second article, author George describes EMIT as a "homogeneous enzyme immunoassay [technique] based on the competition for antibody binding sites," where a "drug concentration in [a] sample can be measured in terms of enzyme activity."[9] Commercially available since the 1970s, EMIT is one of the many immunoassays that can rapidly detect a wide range of substances, including illicit drugs, from relatively small forensic sample volumes.[10] Designed as an initial screening test, EMIT filters out negative samples from positives, thereby reducing the amount of further analytical work required for toxicological investigation.[11] Positive results are then confirmed by other techniques. Noting that only samples with positive results are then subjected to more sensitive confirmatory techniques, George states that immunoassays must be "rapid, accurate, and reproducible."[12] Immunoassays such as EMIT have gained wide acceptance and are now extensively used in analytical laboratories.[13]

### 3. *Published Judicial Opinions*

Appellant also offered twelve published judicial opinions from other jurisdictions.[14] In all

---

[8] *Id*.

[9] Steve George, *Position of immunological techniques in screening in clinical toxicology*, 42 CLIN. CHEM. LAB. MED. 1288, 1291 (2004).

[10] *Id*. at 1291-92, 1296.

[11] *Id*. at 1291.

[12] *Id*. at 1292.

[13] *Id*. at 1306.

[14] *Jones v. United States*, 548 A.2d 35 (D.C. App. 1988); *Spence v. Farrier*, 807 F.2d 753 (8th Cir.1986); *Jensen v. Lick*, 589 F.Supp. 35 (D.N.D.1984); *Peranzo v. Coughlin*, 675 F. Supp. 102
(continued...)

twelve cases, courts addressed the admissibility of drug testing evidence in prison disciplinary and parole revocation hearings.[15] In most of the cases, courts addressed the reliability of EMIT testing directly and concluded that EMIT test results were sufficiently reliable for admission into evidence. In others, courts addressed the reliability of non-EMIT forms of drug testing. In those cases, the courts took notice of the reliability of the EMIT test and then concluded that the non-EMIT forms of drug testing at issue were admissible based on their similarities to the EMIT test.

The trial court excluded the EMIT test results. Based on the evidence admitted at trial, the jury convicted appellant of intoxication manslaughter. Punishment was assessed at twelve years' imprisonment, and an $8000 fine.

### C. Court of Appeals

On appeal, appellant argued that he had sufficiently established that the EMIT test results were reliable and relevant, that the trial court erred in excluding this evidence, and that this exclusion deprived appellant of his constitutional right to present a defense. The State's response did not address reliability but argued only that the EMIT test results were irrelevant. After a brief discussion of the facts, the Court of Appeals affirmed the judgment of the trial court with respect to the EMIT test results, holding that "the EMIT test was positive for cocaine, but the confirmation GC test was negative. EMIT test results are not reliable without a positive confirmation test. The trial court did

---

(...continued)
(1987); *Driver v. State*, 576 So.2d 675 (Ala. Cr. App. 1991); *Works v. State*, 575 So.2d 622 (Ala. Cr. App. 1991); *Smith v. State*, 250 Ga. 438, 298 S.E. 2d 482 (1983); *Carter v. State*, 706 N.E.2d 552 (Ind.1999); *Crutchfield v. Hannigan*, 21 Kan. App.2d 693, 906 P.2d 184 (1995); *Anderson v. McKune,* 23 Kan. App.2d 803, 807, 937 P.2d 16, cert. denied 522 U.S. 958 (1997); *Penrod v. State*, 611 N.E.2d 653, 654 (Ind.App., 2nd Dist.1993); *People v. Nolan*, 95 Cal. App. 4th 1210, 116 Cal. Rptr. 2d 331 (2nd Dist. 6th Div. 2002).

[15] These cases are discussed in detail in the next section of this opinion.

not abuse its discretion in excluding the test results."[16]

In his dissent, Justice Reyna summarized the expert testimony presented at the Rule 702 hearing and referred to a past observation by a concurring opinion from this Court that EMIT test results have been "overwhelmingly accepted as reliable" and that their reliability is "well recognized."[17]  He stated that as a screening test for the presence of drugs, the EMIT test is similar to portable breath testing devices and the HGN test, both of which have been ruled admissible.[18] Then, after pointing out that the trial court had excluded the EMIT test results as "irrelevant," he discussed the facts of the case and cited to this Court's opinion in *Kirsch v. State*, in which we held that "evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence."[19] Justice Reyna concluded that the trial court abused its discretion by excluding the EMIT test results and, as a result, deprived appellant of his constitutional right to present a defense.

## II. ANALYSIS

### A. Appellant's Argument

Appellant contends that the Court of Appeals erred in holding that EMIT test results are not reliable without a confirmation test.[20]  Appellant argues that the Court of Appeals "did not cite any

---

[16] *Somers v. State*, 333 S.W.3d 747, 753 (Tex.App.–Waco 2010, pet. granted).

[17] *Id*. at 758 (citing *Hernandez v. State*, 116 S.W.3d 26, 42 (Tex. Crim. App. 2003) (Keller, P.J., concurring)).

[18] *Id*. at 758.

[19] *Id*. at 758-59 (citing *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010)).

[20] Appellant also argues that the EMIT test results were relevant and admissible under 403. We will not address that portion of appellant's brief since the Court of Appeals upheld the exclusion
(continued...)

authority for its holding," and that "this is understandable because there is no such authority – an EMIT test is reliable on its own and does not need a confirmation test to be admissible." Appellant argues that the trial record shows he proved by clear and convincing evidence through expert testimony that EMIT, with or without a confirmatory GC/MS test, is reliable scientific evidence. Appellant further argues that the record shows he introduced scientific literature and several published judicial opinions from which the trial court could have taken judicial notice of the reliability of EMIT testing.

## B. Legal Framework

Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.[21] The threshold determination in an inquiry into the admissibility of scientific evidence is whether the evidence is helpful to the trier of fact, and for such evidence to be helpful, it must be reliable.[22] A trial court must act as a gatekeeper to ensure that unreliable evidence does not reach the trier of fact.[23]

---

(...continued)
solely on reliability grounds.

[21] TEX. R. EVID. 702.

[22] *Emerson*, 880 SW 2d at 763; *Mata v. State*, 46 S.W.3d 902, 908 (Tex. Crim. App. 2001) ("While Rule 702 involves the 'dual inquiry of relevance and reliability,' the 'overarching subject of Rule 702 is the scientific validity of the evidence at issue.'") (quoting *Jordan v. State*, 928 S.W.2d 550, 554-55 (Tex. Crim. App. 1996).

[23] *Kelly*, 824 S.W.2d at 572 ("Unreliable ... scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts.") (quoting Kenneth R. Kreiling, *Scientific*
(continued...)

The proponent of scientific evidence must persuade the trial court through clear and convincing evidence that the proposed evidence is reliable.[24]  In *Kelly v. State* we held that this burden is met by showing that: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question.[25]  We also identified the following nonexclusive list of factors that a trial court could consider in determining reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained; (2) the existence of literature supporting or rejecting the underlying scientific theory and technique; (3) the clarity with which the underlying scientific theory and technique can be explained to the court; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the qualifications of the expert(s) testifying; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.[26]

In some cases the first two prongs of the *Kelly* test – the validity of the underlying scientific theory and the validity of the technique applying that theory – can be determined through judicial notice, thereby relieving the proponent of the burden of producing evidence on that question.[27]  We

_____

(...continued)
*Evidence: Toward Providing the Lay Trier With the Comprehensible and Reliable Evidence Necessary to Meet the Goals of the Rules of Evidence*, 32 ARIZ. L. REV. 915, 941-42 (1990)).

[24] *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000).

[25] *Kelly*, 824 S.W.2d at 573.

[26] *Id*.

[27] *Weatherred v. State*, 15 S.W.3d 540, 542 n.4 (Tex. Crim. App. 2000).  Unlike the first two *Kelly* prongs, the third *Kelly* prong – whether the technique was properly applied on the occasion in question – must necessarily be decided on a case-by-case basis.  *Hartman v. State*, 946 SW 2d 60,

(continued...)

have held that trial courts are not required to "reinvent the scientific wheel" in every trial.[28] However some trial court somewhere must have actually "examined and assessed the reliability of the particular scientific wheel before other courts may ride along behind it."[29] Once the validity of a scientific theory or technique has been widely accepted in a sufficient number of trial courts through adversarial gatekeeping hearings, future courts may take judicial notice of the validity of that theory or technique based upon the process, materials, and evidence produced at those prior hearings.[30] When evaluating a trial judge's gatekeeping decision, appellate courts may take judicial notice of other appellate opinions concerning a specific scientific theory or technique.[31] However, appellate courts may not be "independent scientific sleuths to ferret out the appropriate scientific materials," and "judicial notice on appeal cannot serve as the sole source of support for a bare trial court record concerning reliability."[32]

---

(...continued)
64 (Tex. Crim. App. 1997).

[28] *Hernandez*, 116 S.W.3d at 29 ("It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown 'gatekeeping' hearings under *Kelly*.").

[29] *Id*.

[30] *Id*. at 29 n.6 ("We have no 'bright line' judicial rule for when a scientific theory or technique becomes so widely accepted or persuasively proven that future courts may take judicial notice of its reliability. However, the more extensive the gatekeeping hearing, the more noted and numerous the experts who testify, submit, affidavits, or otherwise provide information, the more scientific material (both pro and con) that is consulted and discussed at a seminal gatekeeping hearing, the more likely it is that a reviewing court will declare that future trial courts may take judicial notice of the validity or invalidity of that extensively litigated scientific proposition.").

[31] *Id*. at 31-32.

[32] *Id*. at 30-32 ("The trial court hearing is the main event for *Daubert/Kelly* gatekeeping hearings; it is not a try-out on the road to an appellate scientific seminar.").

## C. Cases Discussing EMIT

EMIT tests have been accepted as reliable and admissible in courts across numerous jurisdictions, including several federal courts. In *Jones v. United States*, the DC Court of Appeals confronted the issue of whether two positive EMIT test results obtained from the same sample were sufficiently reliable for admission into evidence.[33] Faced with a sparse trial record, the *Jones* court stated that it would look to other judicial decisions "which themselves have a trial record – or judicially notice a trial record – that reflects expert testimony, subject to cross-examination about [the EMIT test]."[34] The court looked to several state and federal cases that had addressed the reliability of the EMIT test.[35] In one of the cases cited, *Lahey v. Kelly*, the Court of Appeals of New York described the underlying theory and technique of EMIT testing in detail and noted that the "major advantages of the EMIT test are that it is quick, relatively inexpensive, and can be operated by people who are not scientific experts."[36] The *Lahey* court cited a report stating that, according to surveys conducted since 1972 on the reliability of different analytical methods of drug testing, EMIT tests "have been shown to be among the most consistently accurate drug testing methods in current use," with recently published data showing that the percentage of correct results from EMIT tests ranged from 97% (for amphetamines, barbiturates, morphine and phencyclidine) to 99% (for cocaine and methadone).[37]

---

[33] 548 A.2d 35 (D.C. App. 1988).

[34] *Id*. at 46.

[35] *Id*. at 46 (citing several cases, including *Lahey v. Kelly*, 71 N.Y.2d 135 (1987)).

[36] *Lahey*, 71 N.Y.2d at 140-41.

[37] *Id*. at 139.

The *Jones* court also looked to a recent case in which a trial court from its own jurisdiction had addressed the issue of EMIT reliability. In that case, *United States v. Roy*, the defendant had allegedly violated conditions of his pretrial release by ingesting drugs, and the government's evidence consisted solely of a series of positive EMIT drug test results.[38] The trial record in *Roy* included extensive testimony from Robert Murphy, a pharmokinetics expert and technical service representative employed by Syva, which is the company that developed, manufactured, and sold the EMIT drug test, and which also installed the test equipment and trained the technicians who would be using it.[39] Murphy provided detailed testimony regarding the scientific bases of the EMIT system and how it works.[40] He testified that the EMIT system had been shown to be 98% accurate, had a bias toward false negative rather than false positive results, had been in use since 1981 or 1982, and was used at the National Institutes of Health and in private industry, the military, and various law enforcement agencies, as well as in hospitals in several states for the purposes of drug treatment, emergency room diagnosis, and the monitoring of certain drugs.[41] Based on Murphy's testimony and the scientific literature on EMIT testing, the trial court in *Roy* held that the EMIT system was sufficiently reliable and accepted in the scientific community to be admissible in a trial.[42]

---

[38] *Jones*, 548 A.2d at 45 (citing *Roy v. United States*, 113 Daily Wash.L.Rptr. 2317 (November 15, 1985)).

[39] *Id*. at 45 (citing *Roy*, 113 Daily Wash.L.Rptr. at 2319) ("pharmokinetics" is the study of bodily absorption, distribution, metabolism, and excretion of drugs).

[40] *Id*. at 45 (citing *Roy*, 113 Daily Wash.L.Rptr. at 2319-20).

[41] *Id*. at 45-46 (citing *Roy*, 113 Daily Wash.L.Rptr. at 2320).

[42] *Id*. at 46 (citing *Roy*, 113 Daily Wash.L.Rptr. at 2321) (The *Roy* court found that the literature showed a "uniform acceptance of the enzyme immunoassay technique in general and of the EMIT system in particular.")

The DC Court of Appeals in *Jones* ultimately concluded that "EMIT test results are presumptively reliable and thus generally admissible into evidence in every case."[43] In reaching this conclusion, the court stated: "We . . . rely primarily on [the *Roy* opinion] from our own jurisdiction, based on expert scientific evidence in a record with which we are familiar and in which we have confidence because of the thoroughness with which counsel tried the case and the judge evaluated the evidence. We rely secondarily on, and thus confirm our judgment by reference to, judicial opinions from other jurisdictions which have reached the same result."[44]

In *Spence v. Farrier*, the Eighth Circuit Court of Appeals held that prison disciplinary actions based on double EMIT tests[45] sufficiently met due process standards, even where inmates could not call expert witnesses or have confirmatory tests by alternate methodologies.[46] The court cited numerous state and federal cases addressing the reliability of EMIT tests as well as one of its own recent opinions in which it had noted that EMIT test results are 95% accurate.[47] The court concluded that "EMIT test results obviously provide some evidence of drug use" and that EMIT tests have been shown to be "widely accepted" and "sufficiently reliable to meet the requirements of the due process clause."[48] A few years later in *Harrison v. Dahm*, a defendant argued that a single,

---

[43] *Jones*, 548 A.2d at 46.

[44] *Id*.

[45] This refers to an EMIT test followed by a second EMIT test.

[46] 807 F.2d 753 (8th Cir.1986) (all positive EMIT test results were followed by a second EMIT test on the sample).

[47] *Id*. at 756 (citing multiple cases, including *Harmon v. Auger*, 768 F.2d 270 (8th Cir.1985) (EMIT test results are 95% accurate and form a sufficient basis for disciplinary action)).

[48] *Spence*, 807 F.2d 753 at 756-57.

unconfirmed, positive EMIT test did not sufficiently establish drug use and that, under the Eighth Circuit's holding in *Spence*, the EMIT test satisfies due process only when confirmed by a second test.[49] The Eighth Circuit rejected this argument and stated: "While the EMIT test at issue in *Spence* was confirmed by a second test, we do not read our holding so narrowly . . . given that *Spence* does not require a second test, and given the established and recognized reliability of the test, it is not a due process violation to fail to administer a second test."[50]

In another federal appellate opinion, *Higgs v. Bland*, the Sixth Circuit Court of Appeals vacated a district court's holding enjoining prison officials from taking disciplinary action against inmates based solely on unconfirmed, positive EMIT tests.[51] The record included a booklet published by the manufacturers of EMIT which provided that "[i]t is good scientific practice to confirm a positive result from any test method in cases where a person's rights, privileges, treatment or employment is at stake."[52] The Court of Appeals noted that experts on the record described EMIT as "a useful tool in the detection of drug presence in the body of the person tested."[53] The court also pointed out that "no evidence was produced in [the] case to indicate that the probability of false

---

[49] *Harrison v. Dahm*, 911 F.2d 37, 41-42 (8th Cir. 1990) (holding that a single, uncorroborated EMIT test is admissible in a prison disciplinary setting).

[50] *Id*. at 42.

[51] *Higgs v. Bland*, 888 F.2d 443 (6th Cir. 1989).

[52] *Higgs v. Wilson*, 616 F. Supp. 226, 229 (W.D.Ky. 1985), *vacated*, 793 F.2d 1291 (6th Cir.1986) (not designated for publication), *on subsequent appeal sub nom. Higgs v. Bland*, 888 F.2d 443 (6th Cir. 1989).

[53] *Higgs v. Bland*, 888 F.2d at 445.

results was more than a mathematical possibility."[54] After observing that "[t]he reliability of the EMIT test has repeatedly been found to meet due process standards," the court found "little difficulty in concluding that the presence of a positive EMIT test constitutes 'some evidence' from which [a prison disciplinary board] could conclude that a tested inmate was guilty of the offense of drug use."[55]

Federal district courts have also found EMIT tests to be reliable. In *Jensen v. Lick*, a federal district court in North Dakota held that a prison official could impose sanctions on a prisoner based upon a single, unconfirmed, positive EMIT test.[56] The court noted that the Center for Disease Control in Atlanta had found EMIT test results to be 97-99% accurate.[57] The court also cited a claim by the manufacturers of the EMIT test equipment that "testors can act with a 95% confidence in the accuracy of the result," and noted that "as used, the 95% statistical figure, in the field of science and medicine, is recognized to mean almost complete certainty."[58] The court concluded that such a high level of reliability was adequate to support a decision for administrative punishment in the prison circumstance, even under a "beyond a reasonable doubt" standard of proof.[59]

In *Peranzo v. Coughlin*, a federal district court in New York held that "with a 98+% rate of accuracy," double EMIT testing is "sufficiently reliable so that the use of the results as evidence,

---

[54] *Id*. at 449.

[55] *Id*. (citing *Spence* and all the cases cited therein).

[56] 589 F.Supp. 35 (D.N.D.1984).

[57] *Id*. at 38.

[58] *Id*.

[59] *Id*. at 39.

even as the only evidence, in a disciplinary hearing does not offend due process," nor does "the introduction of the results as an element to be considered in parole decisions."[60] This decision was upheld by the Second Circuit Court of Appeals one year later.[61]

EMIT tests have also been accepted as reliable and admissible in several state courts. In *Driver v. State*, the Alabama Court of Criminal Appeals held that the positive results of two routine double EMIT tests conducted on two separate occasions were sufficiently reliable for use in prison disciplinary proceedings involving an inmate's alleged use of controlled substances.[62] The court cited expert testimony from a research toxicologist with the Georgia Bureau of Investigation, also an inspector for the National Institutes on Drug Abuse, who testified that EMIT testing equipment was considered to be 95% accurate.[63] The court also cited *Spence* and all the cases cited therein, as well as an unpublished opinion from the Fourth Circuit Court of Appeals holding that "the EMIT test, scientifically recognized as a valid medical procedure, constitutes some evidence to support the imposition of disciplinary sanctions."[64] Relying on the stipulated expert testimony contained in the

---

[60] 675 F. Supp. 102, 103, 105 (1987) (the court cited a scientific study conducted by the New York Department of Correctional Services under the auspices of the American Association of Bioanalysts (AAB) and specifically noted that the AAB Proficiency Testing Service is one of three testing services approved by the Federal Centers for Disease Control).

[61] *Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988) (upholding *Peranzo v. Coughlin*, 675 F. Supp. 102 (1987)).

[62] 576 So.2d 675 (Ala. Cr. App. 1991).

[63] *Id*. at 677.

[64] *Id*. (citing *Thompson v. Hall*, 883 F.2d 70 (4th Cir.1989)). In a published decision handed down that same year, the Fourth Circuit Court of Appeals described EMIT as a "widely used screening technique" and cited the Eighth Circuit's holding in *Spence* that "reliance on the EMIT testing procedure does not constitute a denial of due process." *Ballard v. Carlson*, 882 F.2d 93, 94 (4th Cir. 1989).

trial record, as well as the "general acceptances of the reliability of EMIT testing in other jurisdictions," the *Driver* court concluded that the EMIT test results were sufficiently reliable.[65] The Alabama Court of Criminal Appeals found EMIT test results reliable again in *Works v. State*, which was handed down on the same day as *Driver* and had nearly identical facts.[66]

In *Smith v. State*, a plaintiff's probation was revoked solely on the basis of a single, positive, unconfirmed EMIT test.[67] The Supreme Court of Georgia explained that when ruling on admission of scientific evidence, a trial court must decide whether the underlying scientific procedure or technique had reached a "scientific stage of verifiable certainty."[68] The court further explained that a trial court should not make this determination by "simply calculating the consensus in the scientific community" but should base the determination on evidence presented at trial, such as expert testimony, exhibits, treatises, or the rationale of cases in other jurisdictions.[69] The court noted that the evidence presented at trial included expert testimony concerning the operation and accuracy of EMIT from both a State Crime Laboratory representative and a laboratory operator.[70] The court concluded that this evidence supported the trial court's determination that the EMIT test results were reliable and admissible.[71]

---

[65] *Driver*, 576 So.2d at 677.

[66] 575 So.2d 622 (Ala. Cr. App. 1991).

[67] 250 Ga. 438, 298 S.E.2d 482 (1983).

[68] *Id*. at 440 (citing *Harper v. State*, 249 Ga. 519, 292 S.E.2d 389).

[69] *Id*.

[70] *Id*. at 439-40.

[71] *Id*. at 440.

The Supreme Court of Indiana addressed the reliability of EMIT testing in *Carter v. State*.[72] At a defendant's probation revocation hearing, the State presented testimony of a lab technician who conducted EMIT tests on two separate occasions, both of which yielded positive results. The court upheld the decision to terminate the defendant's probation, stating that "[u]rinalysis technology is hardly novel and has become a conventional means of drug-testing, the results of which have been deemed reliable in Indiana courts."[73] Citing to a case from its own jurisdiction, the court noted that the EMIT urinalysis system has "reached [a] level of general acceptance in [the] scientific community to be generally admissible."[74]

Some state courts have acknowledged the reliability of EMIT tests in cases where non-EMIT drug tests are at issue. In these cases, the courts have admitted the non-EMIT drug tests based upon their similarities to EMIT. For example, in *Crutchfield v. Hannigan*, a Kansas Court of Appeals held that the results of an ONTRAK test, an immunoassay test similar to EMIT, were reliable and admissible in a prison disciplinary hearing.[75] The court stated that "[c]ourts considering similar urinalysis test results in prison drug surveillance cases have consistently found the test results sufficiently reliable to satisfy constitutional standards."[76] To support that statement, the court cited to a single case in which a federal district court in Oklahoma concluded that EMIT test results were

---

[72] 706 N.E.2d 552 (Ind.1999). The court refers to the urinalysis test at issue in the case as "CIVA." We assume this was an inaccurately transcribed spelling of "Syva," which would denote the EMIT test devised by Syva Corporation.

[73] *Id*. at 554.

[74] *Id*. (citing *Penrod v. State*, 611 N.E.2d 653 (Ind.App., 2nd Dist.1993)).

[75] 21 Kan. App.2d 693, 906 P.2d 184 (1995).

[76] *Id*. at 696.

sufficiently reliable and admissible in prison disciplinary hearings.[77] A few years later, in *Anderson v. McKune*, the same Kansas Court of Appeals reversed a trial court's holding that ONTRAK test results were admissible only with a GC/MS confirmation test.[78] As in *Crutchfield*, the court supported the conclusion that ONTRAK test results are reliable and admissible by citing cases from other jurisdictions that had found EMIT test results to be reliable.[79]

Similarly, in *Penrod v. State*, an Indiana Court of Appeals upheld the admission of ADx drug test results in a parole revocation hearing based solely on the conclusion that ADx and EMIT are "basically the same technology."[80] Relying upon "the persuasive opinion" in *Jones* and all the cases cited therein, the court acknowledged that EMIT had gained general acceptance in the scientific community.[81] Then, based upon concessions by defendant at trial that "there is no difference" between ADx and EMIT and that "[a]lthough the names may be a little different they are basically the same," the court ruled that ADx had reached a similar level of acceptances as EMIT.[82]

Finally, in *People v. Nolan*, a California court of appeals addressed the admissibility of ADx test results by comparing ADx to EMIT.[83] Citing to numerous other cases, the court noted that both tests use the "well-accepted immunoassay scientific technique to detect drugs in urine," and

---

[77] *Id*. (citing *Adkins v. Martin*, 699 F. Supp. 1510, 1513 (W.D. Okla. 1988)).

[78] 23 Kan. App.2d 803, 937 P.2d 16, cert. denied 522 U.S. 958 (1997).

[79] *Id*. at 808-09 (citing *Spence* and *Higgs v. Bland*).

[80] 611 N.E.2d 653, 654 (Ind.App., 2nd Dist.1993).

[81] *Id*.

[82] *Id*. at 654.

[83] 95 Cal. App. 4th 1210, 116 Cal. Rptr. 2d 331 (2nd Dist. 6th Div. 2002).

concluded that ADx had reached a level of general acceptance in the scientific community.[84]

The case law clearly demonstrates that EMIT testing is widely used and has been repeatedly accepted as sufficiently reliable for admission into evidence in both state and federal courts.[85]

### D. *Kelly* Test

The reliability of EMIT testing is an issue of first impression in this Court.[86]  Under the legal framework discussed above, we look to the trial record and to permissible methods of taking judicial notice to determine whether EMIT testing has met the first two prongs of the Kelly test.[87]  Appellant argues that the reliability of EMIT with or without a confirmation test was established, as the expert witnesses individually and/or collectively testified to facts sufficient to prove by clear and convincing evidence that: (1) the underlying scientific theory of EMIT is valid; and (2) the technique applying the theory of EMIT is valid.[88]  He further argues that this conclusion was buttressed by the

---

[84] *Id*. at 334 (citing *Penrod*, *Carter*, and *Spence)*.

[85] *See also Petition of Johnston*, 109 Wash.2d 493, 745 P.2d 864 (1987) (single positive EMIT test result "clearly provides some evidence" of drug use);  *Wycoff v. Resig*, 613 F.Supp. 1504 (N.D.Ind.1985) (a positive EMIT test confirmed by a second EMIT test or its equivalent satisfies due process); *Jones–Heim v. Reed*, 241 Fed.Appx. 359 (9th Cir. 2007) (not designated for publication) ("Courts reviewing the evidentiary value of drug tests have repeatedly held that EMIT meets due process standards . . . [f]urther, courts have specifically found that EMIT demonstrates the necessary 'indicia of reliability'"); *Lomax v. McCaughtry*, 949 F.2d 398 (7th Cir.1991) (not designated for publication) ("[C]ourts have found EMIT tests sufficiently reliable to meet the standards of the Due Process Clause").

[86] *But see Hernandez*, 116 S.W.3d at 41-42 (Keller, P.J., concurring) (discussing reliability of EMIT testing as compared to other types of testing, and noting that the reliability of EMIT testing has been litigated extensively before fact-finders in other jurisdictions ).

[87] Given the Court of Appeals's basis for upholding the exclusion of the EMIT test results, our inquiry is limited to the general validity of the scientific theory and technique of EMIT testing.  We do not address the ultimate admissibility of the EMIT test results in this case.

[88] Appellant also argues that the third *Kelly* prong – whether the technique was properly
(continued...)

admission of two scientific articles and twelve cases addressing EMIT.  We agree.

### 1. *The Acceptance of the Underlying Scientific Theory and Technique by the Scientific Community*

The expert witness testimony demonstrates that the underlying scientific theory and technique of the EMIT test are accepted as valid by the accredited DPS laboratory and the greater forensic toxicology community in Texas.  One of the experts pointed out that DPS takes in thousands of cases from all over Texas every year, averaging 300 to 500 cases every month.  The extent to which DPS accepts the theory and technique of EMIT is evident from the fact that DPS requires initial EMIT screening of cases before the more expensive and accurate GC/MS test is used.

Beyond Texas, the articles offered by appellant together with the pervasiveness of EMIT testing in the case law demonstrate that the underlying theory and technique of the EMIT test are widely accepted as valid in the greater scientific community.  The articles discuss EMIT as one of the many immunoassays that have gained wide acceptance and are internationally used in analytical laboratories.  The various courts in the cases cited have found that EMIT testing is widely used and has reached a level of general acceptance.  In one of the cases, the DC Court of Appeals noted that since 1981 or 1982, EMIT has been in use at the National Institutes of Health and in private industry, the military, and various law enforcement agencies, as well as in hospitals in several states for the purposes of drug treatment, emergency room diagnosis, and the monitoring of certain drugs.[89]

---

[88](...continued)
applied on the occasion in question – was established, as Barton specifically testified that she ran the EMIT test properly, according to the instructions, and according to the way that it is supposed to be run.  The State has not contended, and there is no evidence in the record to suggest, that the EMIT technique was not properly applied in this case.

[89] *Jones*, 548 A.2d at 45-46.

### 2. *The Existence of Literature Supporting or Rejecting the Underlying Scientific Theory and Technique*

At the rule 702 hearing, expert witness Barton agreed that there is literature supporting EMIT as a reliable screening test. Indeed, as we previously noted, the articles offered by appellant discuss the value of EMIT testing as an initial screening procedure and the extent to which the underlying theory and technique are accepted as valid. The cases on the record provide further evidence of the existence of literature supporting the underlying scientific theory and technique of EMIT testing, as many of the cases cited mention surveys, reports, and studies on the subject of EMIT reliability.[90]

### 3. *The Clarity with which the Underlying Scientific Theory and Technique can be Explained to the Court*

Appellant's experts clearly explained the underlying theory and technique of EMIT testing to the trial court. From their testimony, the trial court could understand that EMIT is a screening test based on enzyme reactions. As the experts explained, certain antibodies will react only with a particular class of drugs—"kind of like a lock-and-key mechanism." Antibodies are added to blood samples placed in the EMIT device and reactions are made apparent by color changes. These reactions are indicative of the presence of one of six specific classes of drugs. The reactions are then measured to determine the basic concentrations of drugs in the blood.

### 4. *The Potential Rate of Error of the Technique*

The expert testimony at the Rule 702 hearing suggests that the potential rate of error in EMIT testing is very low. Barton testified that out of the thousands of EMIT tests that she had performed at DPS, she had never personally encountered a false positive. Hawkins testified that she had

---

[90] *See e.g.*, *Lahey*, 518 N.E.2d at 927; *Jones*, 548 A.2d at 46; *Jensen*, 589 F.Supp. at 38; *Peranzo*, 675 F.Supp. at 103-04.

performed hundreds of GC/MS tests at DPS following positive EMIT tests for cocaine and that Briggs's test was the only one to come out negative. Moreover, according to the various reports, studies, and testimony from the records of the cases cited, EMIT tests are over 95% accurate.[91] When testing specifically for the presence of cocaine, one report stated that EMIT tests are 99% accurate.[92] This potential rate of error is significantly lower than that of the HGN test, which we recognized as reliable in *Emerson v. State*.[93]

We note that although the GC/MS test for cocaine in Briggs's case was negative, the evidence on the record suggests that this result was not indicative of a false positive EMIT test. Barton testified that the EMIT results indicated a presence of cocaine metabolites in Briggs's blood that fell into the third highest level of concentration. The GC/MS test was conducted more than one year after Briggs's blood was drawn. Both Barton and Hawkins explained that cocaine breaks down quickly in the blood and that the negative GC/MS test in Briggs's case could likely be attributed to the absence of a preservative in Briggs's blood sample. Significantly, the record shows that the GC/MS test did in fact show traces of cocaine in Briggs's blood even after this passage of time, but at a level below the minimum required by DPS protocol to be reported as positive. This evidence suggests that the negative GC/MS test in this case does not reflect upon the scientific accuracy of the EMIT test.

**5.** *The Availability of Other Experts to Test and Evaluate the Technique*

---

[91] See e.g., *Jones*, 548 A.2d. at 45-46; *Spence*, 807 F.2d at 756 (citing *Harmon*, 768 F.2d at 276); *Jensen*, 589 F.Supp. at 38; *Peranzo*, 675 F. Supp. at 105; *Driver*, 576 So.2d at 677.

[92] *Lahey*, 518 N.E.2d at 927.

[93] We noted in *Emerson* that use of an HGN test alone has been found to result in a correct determination of intoxication only 77% of the time. When considered in conjunction with the walk and turn test, the accuracy of the HGN test increases to approximately 80%. 880 S.W.2d at 767.

Appellant's experts testified as to the validity and reliability of the EMIT test and were subject to cross-examination by the State. Additionally, many of the courts in the cases cited relied upon expert evaluations of the EMIT technique from their records. These experts included a technical service representative and pharmokinetics expert employed by the company that developed and manufactures the EMIT test,[94] a research toxicologist with the Georgia Bureau of Investigation who was also an inspector for the National Institutes on Drug Abuse,[95] and a representative and laboratory operator from the Georgia State Crime Laboratory.[96]

### 6. *The Qualifications of the Experts Testifying*

All three of appellant's experts, Barton, Hawkins, and Erwin, provided testimony relating to the factors discussed above. For that reason, we look to their qualifications for assurance that we can reasonably rely on their pronouncements.

Barton testified that she earned a bachelor of science degree from the University of Texas and had completed in-house training at DPS, which consisted of taking written tests and learning the theories behind the instruments and analyses performed. She further testified that she had performed thousands of analyses since she began her career at DPS. Hawkins testified that she earned a bachelor of science degree in chemistry from the University of Texas and was a trained toxicologist. She testified that she had conducted hundreds of GC/MS tests on blood samples following positive EMIT tests for cocaine. Finally, Erwin testified that she earned a bachelor of science degree in chemistry with a minor in biology, as well as a master of science degree in chemistry with an

---

[94] *Jones*, 548 A.2d at 45.

[95] *Driver*, 576 So.2d at 677.

[96] *Smith*, 298 S.E. 2d at 439.

emphasis on analytical chemistry, from Texas Women's University. Erwin further testified that she had completed postgraduate courses in forensic toxicology at the University of Florida and had recently been certified as a forensic toxicology specialist by the American Board of Forensic Toxicology. Erwin had been employed by DPS for ten years. The qualifications of appellant's experts are such that we believe we can confidently rely upon their testimony relating to the factors discussed above.

The expert testimony, scientific literature, and case law before us demonstrate that EMIT testing is highly accurate, has a low rate of error, and is widely accepted and extensively used as a reliable presumptive screen for the presence of drugs. This evidence leads us to conclude that the validity of the underlying theory and technique of EMIT has been sufficiently established. We find that even a single, unconfirmed EMIT test is reliable scientific evidence that meets the first two *Kelly* prongs.

### III. CONCLUSION

The function of the reliability inquiry under *Kelly v. State* is to assist trial courts in weeding out so-called "junk science" so that only evidence with a basis in sound scientific methodology is admitted. The record contains sufficient evidence showing that EMIT, with or without a confirmation test, is reliable scientific evidence. We conclude that the reliability of even a single, unconfirmed EMIT test has been sufficiently established that it meets the first two *Kelly* prongs. We hold that the Court of Appeals erred in holding that EMIT tests are unreliable without a confirmation test, and we remand for further proceedings consistent with our opinion.

Delivered: June 6, 2012
Publish