OPINION OF THE COURT
Chief Judge Kaye.
Was petitioner denied due process when, in an administrative hearing on charges of ingesting and possessing cocaine, the New York City Police Department produced the supervisor, but not the technicians, employed by the laboratory that performed the EMIT and GC/MS[1] tests on petitioner’s urine specimen? We conclude, as did the Appellate Division, that due process did not require production of the laboratory personnel where no question was raised as to the general reliability of the procedures, where the supervisor familiar with each step in the procedure was subject to cross-examinatian, and where no claim was made of any particular defect in testing petitioner’s specimen.
Petitioner, a long-time New York City police officer, on June 11, 1991 was randomly selected for DOLE urinalysis drug screening. The sample, taken the next day, tested positive for cocaine, and petitioner was charged with violating Department rules by ingesting and possessing cocaine.
At the departmental hearing, where the results were received in evidence, Dr. William Closson, Director of Forensic Toxicology at the Brunswick Hospital Center, under whose direction petitioner’s specimen was tested, described each step followed to ensure the security of samples and accuracy of results. Although he personally reviewed all of the data and chain of custody documentation in concluding that petitioner’s *577 specimen tested positive for cocaine, he did not himself observe or perform the procedures. The Department called none of the toxicologists who actually did the testing or the laboratory technician who processed the specimen.
As Dr. Closson explained, upon arrival at the laboratory the two vials provided by petitioner were inspected by a laboratory technician, who noted no evidence of tampering. Thereafter, one vial was subjected to an EMIT screening test, performed by a toxicologist under Dr. Closson’s direction. That test, which screened for the presence of 10 different drugs, yielded a presumptively positive result for cocaine, so the same test — which yielded a similar result — was performed on the reserve vial by a second toxicologist. Both vials were then subjected to GC/MS, a more sophisticated procedure able to detect the presence of 16 drugs, for confirmation by a third toxicologist of the preliminary positive results. That test detected benzoylecgonine — a cocaine metabolite detectable in urine for three to four days after ingestion of cocaine — in both vials in amounts three to four times higher than the detection limit. All four results were negative as to the presence of any drug other than cocaine.
After reviewing the recorded data and the chain of custody, Dr. Closson prepared a final report for each vial. Based on the positive results in each vial, he concluded that both samples contained benzoylecgonine and reported a positive result for cocaine. The specimen was retained and provided to petitioner for retesting by an independent laboratory. As part of its case, the Department also produced Sergeant Jacques Rodriguez of the Health Services Division, who testified that he witnessed petitioner fill the vials, place the lids on the vials, initial them, seal them with tamper-evident tape, and insert them in a tamper-evident envelope that was sealed in petitioner’s presence.
At the close of the Department’s case, petitioner moved to dismiss the charges on the ground that, without the laboratory technicians, the evidence was legally insufficient. The hearing officer denied the motion.
Petitioner thereafter testified that he did not ingest cocaine and could not account for the positive results; that he refused the offer of his supervisor to postpone the test on account of an important detail that day; and that he had received awards for Meritorious Police Duty and Excellent Police Duty. Petitioner’s supervisor, Lieutenant Phillip Romano, confirmed *578 that petitioner had declined his offer of a postponement, and testified that he had never suspected petitioner of using drugs.
The hearing officer concluded that the Department had proved by a preponderance of credible evidence that petitioner’s urine specimen contained benzoylecgonine, noting that the chain of custody was intact, the results reliably indicated the substance’s presence, and there was no evidence of tampering or contamination. The hearing officer rejected petitioner’s testimony, observing that "denial is one of the primary defense mechanisms of drug abusers” and that "I do not believe that [petitioner’s] use of drugs would necessarily be apparent to co-workers while he was on-duty.” Accordingly, the hearing officer found petitioner guilty as charged and, noting that petitioner had been designated "Chronic Absent, category A” on four occasions in 1987 and one occasion in 1988, and "Chronic Absent, category B” on five occasions in 1988 and two occasions in 1989, recommended termination. The Commissioner thereupon terminated petitioner.
By this CPLR article 78 proceeding petitioner challenged his termination, alleging that he had unlawfully been denied the opportunity to cross-examine the four laboratory technicians who had handled his specimen. The Appellate Division confirmed the Commissioner’s determination. We granted leave and now affirm.
While the constitutional right of confrontation is confined to criminal proceedings (NY Const, art I, §6; US Const 6th Amend), we have as a matter of due process recognized a limited right to cross-examine adverse witnesses in administrative proceedings (see, Matter of McBarnette v Sobol, 83 NY2d 333, 339; Matter of Friedel v Board of Regents, 296 NY 347, 352-353). In assessing whether due process requires the production of particular witnesses for cross-examination, a hearing officer should consider the nature of the evidence, the potential utility of trial confrontation in the fact-finding process, and the burden of producing the witness (see, e.g., People ex rel. McGee v Walters, 62 NY2d 317, 319-320).
We agree with respondent that, in this case, cross-examinatian of the laboratory technicians was not required. Petitioner neither disputes the general reliability of the testing procedures used (see, Matter of Lahey v Kelly, 71 NY2d 135) nor alleges any particular error in handling or testing his speci *579 men.[2] Moreover, the utility of cross-examination would have been limited by the fact that the technicians are unlikely to recall petitioner’s urine specimen, which, like the 50,000 other specimens tested annually, was identified only by number, and production of the four technicians would impose more than a minimal burden on the Department. Petitioner’s due process right was fully protected in the present case by his opportunity to confront the laboratory supervisor and cross-examine him vigorously about every step of the procedure. That examination yielded no evidence of a problem pointing to the need for further questioning of any employee.
Petitioner’s essential claim is that, without confronting each technician, he was foreclosed from uncovering possible human error in this case. We note that other avenues were available to him — for example, he could (and did) examine the testifying witnesses; the specimen, supporting data and other documentation created by the laboratory were provided to him for independent analysis; and the technicians could have been called by petitioner himself (see, Matter of Gray v Adduci, 73 NY2d 741, 743; see also, United States v Inadi, 475 US 387, 396-397).
In the absence of any particular allegation of error, on this record we cannot agree that the hearing officer’s reliance on the testimony of Dr. Closson was unlawful, and we reject the blanket rule proposed by petitioner that due process in every instance requires production of all such witnesses. We note that several courts have rejected similar challenges even in criminal proceedings (see, Minner v Kerby, 30 F3d 1311 [10th Cir 1994] [admitting testimony of laboratory supervisor regarding results of test performed by subordinate]; United States v Smith, 964 F2d 1221 [DC Cir 1992] [same]; Reardon v Manson, 806 F2d 39 [2d Cir 1986], cert denied sub nom. Reardon v Lopes, 481 US 1020 [same]).
Petitioner’s argument ultimately hinges on one assertion: with an accuracy rate of 99 to 99.9% the GC/MS procedure might possibly yield 500 erroneous results out of 50,000 tests annually, and his results could conceivably have been one of the errors. That statistic refers to Dr. Closson’s testimony *580 regarding erroneous results, not all false positives as petitioner claims. But even more to the point, those rates refer to a single GC/MS test. As Dr. Closson testified, where four separate procedures are performed — two EMIT tests and two GC/MS tests — the "margin of error is as close to zero as possible” (see also, Lahey, 71 NY2d, at 142-143, supra).
Addressing the dissent, we agree that no lesser standard of confrontation should be applied to police officers than to anyone else. Due process does not require, however, that, without some particular challenge, every laboratory employee involved in testing a urine sample be produced at an administrative hearing, which would be the consequence of the rule propounded by the dissent. We share as well the underlying concern that one’s career and reputation not be stained by a single test result where there is any possible error in the testing. But it is no answer to establish a constitutional requirement that the laboratory technicians be produced for cross-examination — which is the issue presented to us for review. Such a requirement is surely unwarranted on this record.
Finally, we reject petitioner’s alternative argument that termination was an unduly harsh penalty, in that " 'the measure of punishment or discipline imposed [was not] so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one’s sense of fairness’ ” (Matter of Pell v Board ofEduc., 34 NY2d 222, 233).
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.

. "EMIT” stands for Enzyme Multiple Immunoassay Technique, and "GC/MS” for Gas Chromatography/Mass Spectrometry.

. To the extent petitioner complains of irregularity during collection of his sample, the Department produced Sergeant Rodriguez, the eyewitness to that event. Petitioner himself stipulated to the absence of Sergeant Limratana, a Health Services officer who approved petitioner’s request to pour urine from one vial into the other (see, dissenting opn, at 581).