In the Matter of Mahmood Yoonessi, Petitioner, v State Board for Professional Medical Conduct et al., Respondents.
[769 NYS2d 326]—

Spain, J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of the Hearing Committee of respondent State Board for Professional Medical Conduct which revoked petitioner's license to practice medicine in New York.

Petitioner, a gynecologic oncologist licensed to practice in New York, was charged by the Bureau of Professional Medical Conduct (hereinafter the BPMC) with 30 specifications of misconduct including, as relevant to this proceeding, gross negligence, negligence on more than one occasion, fraud, moral unfitness, lack of proper consent and failure to maintain records. The charges relate to petitioner's treatment of eight patients (hereinafter patients A through H) and allegations that petitioner made a fraudulent representation on a hospital reappointment application. Following a 10-day hearing, a Hearing Committee of respondent State Board for Professional Medical Conduct sustained almost all of the charges finding, among other things, that petitioner had prescribed an unorthodox and

inappropriate chemotherapy regimen for five of the patients, performed unwarranted, contraindicated surgery on at least eight occasions, failed to obtain adequate informed consent for chemotherapy and/or surgery, improperly ignored "Do Not Resuscitate" (hereinafter DNR) orders, and failed to properly examine and/or document examinations of some of these patients. The Committee ordered that petitioner's license be revoked. Petitioner commenced this CPLR article 78 proceeding, seeking annulment of the Committee's determination.

Initially, petitioner makes the following procedural challenges contending that he was deprived of his right to a fair hearing and due process: (1) the Administrative Law Judge (hereinafter ALJ) improperly denied his recusal motion premised upon the ALJ's past representation as an Assistant County Attorney of Erie County and its public hospital in defense of an unrelated lawsuit commenced by petitioner in Federal Court; (2) the Committee was biased against petitioner because its members had been appointed by the State Chair of the BPMC, William Dillon, who, along with one of the Committee members, had participated in previous unrelated litigation commenced by petitioner; (3) the BPMC's expert was biased; (4) the ALJ improperly curtailed petitioner's pro se cross-examination of the BPMC's expert witness and unfairly precluded various exhibits and testimonial evidence; and (5) the BPMC fraudulently altered and/or omitted hospital records entered into evidence.

Petitioner's claims are meritless. "Merely alleging bias is not sufficient to set aside an administrative determination. Rather, the party alleging bias must set forth a factual demonstration supporting the allegation as well as prove that the administrative outcome flowed from it" (*Matter of Sunnen v Administrative Review Bd. for Professional Med. Conduct*, 244 AD2d 790, 791 [1997], *lv denied* 92 NY2d 802 [1998] [citations omitted]; *see Matter of Moss v Chassin*, 209 AD2d 889, 890 [1994], *lv denied* 85 NY2d 805 [1995], *cert denied* 516 US 861 [1995]). Here, with regard to the first two claims, recusal by the ALJ or any member of the Committee was not required because petitioner's record assertions failed to overcome "the presumption of honesty and integrity accorded to administrative body members" (*Matter of Sunnen v Administrative Review Bd. for Professional Med. Conduct, supra* at 792). The ALJ's brief defense of Erie County largely involved the preparation of a successful motion to dismiss on procedural grounds, and the ALJ stated that he did not personally know or meet petitioner during these proceedings, had no financial interest in that action and could not recall any of its details or allegations, and no proof to the contrary was submitted.

Regarding the second claim, bias, the ALJ properly noted that the facts underlying this proceeding and the previous litigation are entirely distinguishable (*cf. Matter of Beer Garden v New York State Liq. Auth.*, 79 NY2d 266, 278-279 [1992]) and, absent concrete evidence of actual bias, petitioner's unsubstantiated allegations were insufficient (*see Matter of Goldsmith v DeBuono*, 245 AD2d 627, 631 [1997]; 10 NYCRR 51.17 [b]). Petitioner's third claim—that the BPMC's expert witness was biased due to his affiliation with a company allegedly endeavoring to compete with oncologists in western New York—likewise was not established.

On the fourth claim, the ALJ's limitation of petitioner's cross-examination of BPMC's expert was not, under the circumstances, an abuse of discretion (*see Matter of Friedel v Board of Regents of Univ. of N.Y.*, 296 NY 347, 352-353 [1947], *remittitur amended* 297 NY 585 [1947]), as it was consistent with the limitations recognized with respect to the right to cross-examine adverse witnesses in administrative proceedings (*see Matter of Gordon v Brown*, 84 NY2d 574, 578 [1994]; *Matter of Gross v New York State Dept. of Health*, 277 AD2d 825, 827-828 [2000]; *see also Matter of Grossberg v Christian*, 245 AD2d 118, 118 [1997]). The record clearly demonstrates that petitioner, who terminated the services of several attorneys in favor of proceeding pro se, repeatedly ignored numerous entreaties by the ALJ and the Committee to focus his cross-examination on relevant issues within the scope of the expert's direct testimony. The ALJ did not excuse the witness until petitioner had incessantly and improperly attempted—over the course of four days of testimony—to introduce evidence which should have been brought out through his direct case or was otherwise comprised of needlessly argumentative or irrelevant lines of questioning. In actuality, the ALJ showed both patience and fairness in his rulings and we discern no abuse of discretion in them.

Petitioner's fifth claim, that the BPMC fraudulently altered hospital records by omitting and/or forging portions thereof, has been reviewed and determined to be without merit. Finally, a careful review of this lengthy record, together with petitioner's speculative and conclusory assertions of various types of unfairness, fails to establish, in any respect, a deprivation of due process or a fair hearing (*see Matter of Goldsmith v DeBuono, supra* at 631).

Addressing the merits, our review of a Committee's decision "is limited to ascertaining whether the determination was supported by substantial evidence" (*Matter of Reddy v State Bd. for Professional Med. Conduct*, 259 AD2d 847, 849 [1999], *lv denied*

93 NY2d 813 [1999]). Here, each charge sustained by the Committee is amply supported by substantial evidence and, thus, "we will defer to the . . . Committee's resolutions of conflicting evidence and credibility" (*Matter of Richstone v Novello*, 284 AD2d 737, 737 [2001]).

With regard to patient A, the record establishes that petitioner's performance of a total abdominal hysterectomy and bilateral salpingo-oophorectomy was without medical indication and needlessly exposed her to a significant reduction in quality of life and an increased risk of infection and death, among other dangers. Petitioner improperly performed the surgery at a hospital which could not provide the dialysis she needed, failed to obtain adequate informed consent from her and failed to obtain necessary nephrologist or cardiologist consults, later improperly authorizing her transfer to another hospital despite her unstable condition. It was within the Committee's province to reject petitioner's explanation that, as the consulting surgeon, he was not primarily responsible for evaluating the patient or determining where the surgery should be conducted.

As to patient B, a 50-year-old female with advanced ovarian cancer whom petitioner treated with chemotherapy and surgery, there is substantial evidence to support the Committee's findings that petitioner's unique drug regimen, for which adequate informed consent was not obtained, did not conform to accepted standards of care in that it utilized many drugs which were at the time determined to be less effective and, further, that he administered the drugs in inconsistent doses and combinations, risking her health and quality of life. The record also supports the Committee's finding that petitioner's performance of an exploratory laparotomy and extensive surgery on patient B was without medical indication and, further, that petitioner inappropriately performed additional surgery on this patient when he should have known that it would serve no therapeutic goal, given that she had no symptoms to palliate and that her cancer had spread in such a way that it could not be surgically reduced.

We reject petitioner's argument that the evidence presented at the hearing demonstrates the existence of a bona fide scientific controversy which would limit administrative resolution, there being no evidence whatsoever to indicate that anyone other than petitioner had achieved successful results through the use of his unorthodox treatment regimen, and because the scientific validity of petitioner's studies were themselves questionable (*cf. Matter of Kirschner v Mills*, 274 AD2d 786, 790-791 [2000]; *Matter of Callahan v University of State of N.Y.*, 129 AD2d 241 [1987]). Notably, no expert testimony was ad-

duced that a legitimate controversy ever existed within the medical community with respect to petitioner's unorthodox chemotherapy regimen, and any conflict among opposing experts and petitioner—who all agreed that this chemotherapy protocol has never been followed or cited by any physician other than petitioner—presented credibility disputes which were exclusively within the province of the Committee to resolve (see Matter of Reddy v State Bd. for Professional Med. Conduct, supra at 849; Matter of Gupta v DeBuono, 229 AD2d 58, 60 [1997]). In defending his regimen, petitioner failed to provide the proper scientific foundation or justification for it, or to ensure that there were adequate safeguards for it. As noted by the Committee, "[r]egardless of the fact that the science of chemotherapy is still a work in progress, any advances can only be sought or accomplished in a tightly controlled scientific atmosphere which first guarantees the safety of patients as well as the highest degree of their informed consent and provides the means to measure and evaluate results."

Turning to patients C, D and G, there is ample evidence in the record to support the Committee's findings that petitioner failed to perform and/or document adequate preoperative histories, physical examinations and assessments, his duty as the primary surgeon. As to patients C, D, E and G, petitioner failed to obtain adequate informed consents from them for surgery and/or his unique chemotherapy regimen, which deviated significantly from the standard forms of chemotherapy treatment then available. Petitioner was unavailable to treat patient C for several days after surgery, thus failing to fulfil his obligation as primary surgeon to arrange for coverage. Moreover, upon learning of the entry of the DNR order authorized by her family when her condition deteriorated, petitioner, wanting to continue aggressive treatment, made an inappropriate accusation and disparaging comments to her family. As to patients D and G, the Committee's similar findings, that petitioner disregarded or canceled DNR orders and failed to follow the established procedure for challenging such orders, are also supported by the record.

With respect to patient D, it was established that the extensive surgery performed by petitioner was not appropriate as he should have realized shortly after commencing the procedure that this patient's cancer could not be effectively reduced in that manner. Substantial evidence also supports the finding that petitioner performed a surgical procedure on patient D without medical indication in that it would have provided little benefit considering her terminal illness. The record fully sup-

ports the Committee's decision to credit the BPMC's expert that petitioner engaged in several incidents with patient E and her family which evidenced his moral unfitness to practice medicine.

Also well founded is the Committee's determination that petitioner's performance of extensive surgery upon patient F was wholly inappropriate, especially in light of his knowledge that she was a Jehovah's Witness who would not accept blood transfusions; petitioner failed to take precautions to minimize her blood loss and the procedure was not medically indicated, as petitioner should have realized shortly after commencing the operation that chemotherapy, not surgery, was her best option. The record also provides substantial evidence in support of the Committee's finding that the chemotherapy that petitioner did administer after surgery was dangerous and inappropriate, given her severely ill condition, and was prescribed without adequate informed consent and absent accurate documentation.

We also confirm the Committee's findings that petitioner negligently performed a surgical procedure on patient H without first obtaining a definitive diagnosis establishing the necessity for such surgery. Petitioner then later performed additional surgical procedures which were not medically indicated.

In addition to the many charges of inappropriate treatment rendered by petitioner for patients A through H, substantial evidence also exists in the record to support the Committee's separate determination that petitioner had, in a reappointment application to St. Joseph's Hospital in December 1999, fraudulently answered in the negative the question, "[I]s there any pending . . . investigation involving you by [the] Office of Professional Medical Conduct?" Correspondence between the Office of Professional Medical Conduct and petitioner in July and August 1999 reflects that petitioner already knew he was under such investigation at the time that he stated otherwise in his reappointment application.

Finally, we conclude that the penalty, discussed thoroughly in the Committee's determination, is entirely appropriate. Notably, petitioner stated that he would continue the underlying courses of conduct if allowed to continue practicing medicine. In our view, the revocation of petitioner's license upon this record is unquestionably not "so incommensurate with the offense as to shock one's sense of fairness" (*Matter of Jean-Baptiste v Sobol*, 209 AD2d 823, 825 [1994]; *see Matter of Mayer v Novello*, 303 AD2d 909, 910 [2003]). All of petitioner's remaining claims— many of which were not raised at the administrative level or lack any record support—have been considered at length and determined to lack any merit.

Crew III, J.P., Mugglin, Rose and Lahtinen, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.