

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00444-CR

| | | |
|---|---|---|
| Stephanie Lynn Bekendam | § | From the 30th District Court |
| | § | of Wichita County (50,166-A) |
| v. | § | March 21, 2013 |
| | § | Opinion by Justice Meier |
| | § | Dissent by Justice Walker |
| The State of Texas | § | (en banc) (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Bill Meier



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00444-CR

STEPHANIE LYNN BEKENDAM                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Stephanie Lynn Bekendam appeals her conviction for driving while intoxicated, felony repetition.[1]  In one issue, Bekendam contends that the trial court erred by allowing the State's expert to testify to trace levels of cocaine that the expert found when analyzing a sample of Bekendam's blood.  We will affirm.

---

[1]*See* Tex. Penal Code Ann. § 49.09(b) (West Supp. 2012).

## II. BACKGROUND

The underlying facts of this case are largely undisputed. The record demonstrates that on February 28, 2008, a witness saw Bekendam driving erratically, colliding her SUV into parked vehicles, and jumping curbs. Bekendam eventually ran a red light and struck another vehicle, injuring its driver and passenger. Emergency medics took Bekendam, the driver of the other vehicle, and its passenger to the hospital. While at the hospital, because an EMT and an attending nurse reported that Bekendam's breath smelled of alcohol, the police procured a sample of Bekendam's blood.

After the blood was tested and determined to contain no alcohol, the State ordered the blood tested for any controlled substances or dangerous drugs. Bekendam does not contest that she operated a motor vehicle in a public place, nor does she contest that she had previously been convicted of two prior charges of driving while intoxicated (DWI). The dispute in this case is whether the trial court erred by allowing the State's expert witness to testify to having found trace levels of cocaine in Bekendam's blood that, according to the State's expert, demonstrates that Bekendam had cocaine in her system both at the time of the blood draw and at the time she ran the red light. Prior to expert testimony at trial, the trial court conducted a *Daubert/Kelly* hearing[2] outside the presence of the jury

---

[2]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

2

to determine whether it would allow the expert to testify to what she had found when analyzing Bekendam's blood.

At the hearing, Renee Hawkins, the State's expert witness who analyzed Bekendam's blood sample, testified that she is a forensic scientist with the Texas Department of Public Safety Crime Laboratory's toxicology section. She testified that she is trained in the analysis of biological specimens for alcohol and drugs. She is a member of the Southwestern Association of Toxicologists and of the International Association of Chemical Testing. Hawkins explained to the trial court that the department has a procedure in which it first tests blood samples for several classes of drugs and then, if any of those classes of drugs are detected and per department policy, a second, additional, confirmation test is conducted to confirm the type of drug and the amount of that drug contained in the sample. Hawkins said that both of these tests are generally accepted within the scientific community and that the results of these tests had been admitted in evidence by courts throughout Texas and the United States. Hawkins testified that she tested Bekendam's blood sample. According to Hawkins, Bekendam's blood tested positive for cocaine[3] using the first test, "enzyme-multiplied *immunoassay*

---

[3]The use of the terms "benzoylecgonine," "the class of cocaine and cocaine metabolites," and "cocaine" are routinely described in caselaw, and by the expert testimony found in those cases, as interchangeable terms when discussing EMIT test results for the drug cocaine. *See*, *e.g.*, *Matter of Gordon v. Brown*, 84 N.Y.2d 574, 577, 644 N.E.2d 1305, 1306 (N.Y. 1994). Indeed, in *Somers*, both the court of appeals and the court of criminal appeals refer to the results of EMIT as a positive test result for cocaine. *Somers v. State*, 333 S.W.3d 747, 753 (Tex. App.—Waco 2010) ("As previously discussed, the EMIT

3

technique," otherwise known as "EMIT."[4]  Hawkins said that she confirmed the

results using "the Gas Chromatograph/Mass Spectrometer or [GCMS]."

According to Hawkins, under GCMS, Bekendam's blood contained traces of both

cocaine and a metabolite, benzoylecgonine, which can only enter the

bloodstream via the consumption of cocaine.  After explaining cocaine's half-life

---

test was positive for cocaine, but the confirmation [GCMS] test was negative."), *overruled on other grounds by* 368 S.W.3d 528, 530 (Tex. Crim. App. 2012) ("The [EMIT] results were positive for both cocaine and amphetamines.").  This language is used by both courts despite their discussions that what is actually being detected using EMIT is cocaine's metabolite, benzoylecgonine.  *Somers*, 333 S.W.3d at 751 ("The [EMIT] test was positive for benzoylecgonine, called cocaine and its metabolites class."); *see also Somers*, 368 S.W.3d at 532 ("EMIT actually tests for the existence of benzoylecgonine, not cocaine.").  But neither court is being "contrary" to the record in that case.  Unlike some classes of drugs that EMIT screens for, cocaine is in a class of its own.  *Somers*, 368 S.W.3d at 531 ("the [EMIT] results indicated a possible positive for benzoylecgonine, or 'cocaine and its metabolites'").  For illustration, EMIT also screens for a class of "amphetamines," but a positive result in this class does not necessarily indicate the specific drug ingested.  *See Martin v. State*, 214 Ga. App. 614, 617, 448 S.E.2d 471, 474 (Ga. Ct. App.—1994), *cert. denied*, (1995) (explaining that after EMIT results indicated the presence of an "amphetamine-like substance," additional testing using GCMS confirmed the presence of methamphetamine).  But a positive result under EMIT in the cocaine and cocaine metabolite class reveals the drug ingested, cocaine.  See *Somers*, 368 S.W.3d at 532 ("[The expert] then agreed that EMIT is a reliable presumptive test to determine whether cocaine has been ingested.").  This is so because as Hawkins testified in this case, "Benzoylecgonine only comes from cocaine."  In *Somers*, Hawkins was also an expert witness.  *Id.*  Throughout *Somers*, when characterizing Hawkins's testimony regarding EMIT in general, the court of criminal appeals routinely refers to the results of EMIT as a positive test for cocaine.  *Id.*  When it comes to cocaine, the limitation in EMIT is not its inability to detect the drug ingested by the host; an "EMIT test alone [will] not indicate how or when an individual ingested cocaine, how much was taken, or whether the individual was a habitual user."  *Id.* at 532–33.  But as we know from *Somers*, "the results of a [GCMS] test would not indicate these facts either."  *Id.*

[4]*See Stedman's Medical Dictionary* 631 (28th ed. 2006).

4

and the level of benzoylecgonine found in Bekendam's blood sample, Hawkins testified that there may have been significant amounts of cocaine in Bekendam's blood at the time she ran the red light and collided with the other vehicle.

Hawkins testified that she did not include cocaine as a drug detected in Bekendam's blood on her toxicology report because the results under the GCMS test were "under the .05 [reportable] cutoff point, .05 is our limit for cocaine." When asked directly why she would testify that Bekendam's blood contained cocaine when her report did not state as such, Hawkins said, "I saw the cocaine, yes, so I did see the trace levels [of cocaine]. [But] [i]t was below my reportable cutoff." At the conclusion of the hearing, the trial court found that Hawkins's testimony "is reliable and relevant. The defense objection is overruled. It will be permitted before the jury."

At trial and in the presence of the jury, Hawkins testified that she detected trace levels of cocaine and cocaine metabolite in Bekendam's blood sample. Specifically to the cocaine detected by use of the GCMS test, Hawkins testified that she saw trace amounts of cocaine in Bekendam's blood that were "below my reportable limit that I'm allowed to report." Hawkins said that the amount of metabolite she detected in Bekendam's blood was "one of the larger amounts that I have reported of [b]enzoylecgonine[,] so it's consistent with a large amount of cocaine use or a habitual use of cocaine." When asked whether Bekendam had cocaine in her system at the time she ran the red light, Hawkins testified, "Since I saw cocaine in the sample at trace amounts [at the time the tests were

5

conducted], based on the short half-life of cocaine and the fact that it degrades in the blood tube, [Bekendam's cocaine blood level] . . . may have been significantly higher at the time" Bekendam ran the red light. Hawkins said that it was her opinion that at the time Bekendam ran the red light, Bekendam would have had cocaine in her bloodstream.

The jury returned a verdict of guilty and set Bekendam's punishment at twenty years' confinement and a $10,000 fine. The trial court entered judgment accordingly. This appeal followed.

### III. DISCUSSION

In her sole issue, Bekendam argues that the trial court erred by allowing Hawkins to testify (1) that a trace amount of cocaine was present in Bekendam's blood at the time of the blood draw and (2) that cocaine would have been in her bloodstream at the time she was operating her SUV when it collided with the other vehicle.

Bekendam's argument is that Hawkins failed to follow the "standards and procedures" of the Texas Department of Public Safety (DPS) when she testified to the amounts of cocaine present in Bekendam's blood at both of these times. Bekendam's argument is predicated on the notion that because DPS requires a two-step procedure by its forensic scientists when screening blood samples for drugs, and that under this procedure the department as a policy does not include in its lab reports any positive test result whenever the second step to that procedure does not indicate a threshold level of certain drugs, Hawkins's

6

testimony was "inherently unreliable and therefore irrelevant" when she testified that she did in fact find trace amounts of cocaine in Bekendam's blood sample using both tests. So, Bekendam argues, even though there were trace amounts of cocaine in her system at the testified-to times, Hawkins should not have been allowed to testify to the matter because she should have been bound by the department's policies for reporting the presence of cocaine.

We review the trial court's decision on the qualifications of an expert or the reliability of her testimony for an abuse of discretion. *See Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). An expert may testify on scientific, technical, or other specialized subjects if the testimony would assist the factfinder in understanding the evidence or determining a fact issue. *See* Tex. R. Evid. 702. The trial court may exclude scientific testimony or evidence that is not reliable. *See Hernandez*, 127 S.W.3d at 218.

To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573; *see also Hartman v. State*, 946 S.W.2d 60, 62–63 (Tex. Crim. App. 1997)

7

(applying *Kelly* standard to all scientific evidence, whether novel or not, that is offered under Tex. R. Evid. 702).

It is the third criterion, whether the scientific technique in question has been properly applied, that Bekendam attacks. Bekendam sets forth the proposition that the failure to follow DPS's policy regarding testing blood samples for illicit drugs is the equivalent of failing to properly apply the scientific technique on the occasion in question.[5] But the equating of the department's policy with any given scientific technique is erroneous. Indeed, within the department's policy for drug screening, two specific scientific techniques are utilized. First, as Hawkins testified, the department utilizes EMIT to determine whether a class of drugs exists in a given sample. If the EMIT test is positive for a class of drugs, including cocaine, then the sample is tested under another scientific technique; namely, the GCMS test. Therefore, contrary to the manner in which Bekendam would have us approach our analysis, we must determine whether the trial court

---

[5]The converse of Bekendam's position is correct pertaining to breath tests. That is, in a hearing regarding reliability of scientific evidence in a DWI prosecution at which the results of a breath test are challenged, all the trial court need do to satisfy its "gate-keeping" function is to determine whether the technique was properly applied in accordance with DPS rules on the particular occasion in question. *Bolen v. State*, 321 S.W.3d 819, 826–27 (Tex. App.— Amarillo 2010, pet. ref'd). This is so because the Legislature has already determined that the underlying science is valid and that the technique applying it is valid so long as it is administered by individuals certified by and using testing techniques approved by the DPS. *Bolen*, 321 S.W.3d at 826. But this rule does not remove the trial court's gate-keeping function on expert testimony regarding techniques not administered in accordance with DPS policy. Nor does this rule dictate that techniques not administered in accordance with DPS policy are per se unreliable.

8

abused its discretion by allowing Hawkins to testify to the results that she ascertained by using the EMIT and GCMS tests. *Hernandez v. State*, 116 S.W.3d 26, 27–29 (Tex. Crim. App. 2003).

In this case, the underlying scientific theory and techniques are not only accepted as valid by the relevant scientific community, they also have been accepted by a number of trial courts and reviewing courts as reliable. *Id.* As Presiding Judge Keller discussed in her concurring opinion in *Hernandez*, the "EMIT system has been overwhelmingly accepted as reliable. The reliability of [the EMIT] test [as a screen for broad categories of drugs] has been litigated extensively before fact-finders, with the parties being able to offer live testimony and to conduct cross-examination." *Hernandez*, 116 S.W.3d at 42 (Keller, P.J., concurring) (*citing Jones v. United States*, 548 A.2d 35, 44–46 (D.C. 1988)); *see also Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir. 1986) (citing cases and discussing general acceptance of EMIT test results as relevant evidence). Following Judge Keller's concurrence in *Hernandez*, the court of criminal appeals recently held that "the reliability of even a single, unconfirmed EMIT test has been sufficiently established that it meets the first two *Kelly* prongs." *Somers v. State*, 368 S.W.3d 528, 545 (Tex. Crim. App. 2012). And much like the facts of this case, the *Somers* court found it significant that the confirming GCMS test "did in fact show traces of cocaine . . . but at a level below the minimum required by DPS protocol to be reported as positive." *Id.* at 544.

9

Similar to EMIT, GCMS has for some time been considered the "Golden Rule" in the field of toxicology to verify or confirm the results of an EMIT test. *Bolieu v. State*, 779 S.W.2d 489, 490 (Tex. App.—Austin 1989, no writ); *see also Combs v. State*, 6 S.W.3d 319, 322 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Texas and Federal courts have found the gas chromatography test to be a reliable method for identifying compounds, and it has been generally accept[ed] in the scientific community.").

Here, the trial court conducted a hearing where the expert testified to her qualifications; to the utilization of both the screening and the confirmation tests she utilized; that these tests are generally accepted in the scientific community; and that testimony concerning these tests has been admitted in courts "across the State of Texas and the United States." Given the general acceptance of these tests within both the scientific and judicial communities, we cannot say that the trial court's decision to allow the expert witness to testify to her findings was outside the zone of reasonable disagreement. *Casey*, 215 S.W.3d at 879. It was certainly within the trial court's discretion to determine that the State's expert testimony regarding her analysis of Bekendam's blood sample would assist the factfinder in understanding the evidence or in determining the question of whether Bekendam had cocaine in her system while she operated her SUV during the time of the incident. *See* Tex. R. Evid. 702.

We conclude and hold that the trial court's determination to allow the State's expert to testify to the level of cocaine found in Bekendam's blood

10

sample—both at the time of the blood draw and at the time of the incident—falls within the zone of reasonable disagreement, even though Hawkins identified trace levels of cocaine and cocaine metabolite that were below minimums set by DPS's policy. We overrule Bekendam's sole issue.

## IV. CONCLUSION

Having overruled Bekendam's sole issue on appeal, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL: EN BANC

WALKER, J., filed a dissenting opinion in which DAUPHINOT and GARDNER, JJ., join.

PUBLISH

DELIVERED: March 21, 2013

11



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00444-CR

STEPHANIE LYNN BEKENDAM                                         APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

----------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## DISSENTING OPINION

----------

I would hold that the trial court abused its discretion by allowing the State's expert witness, Renee Hawkins—a forensic scientist with the Texas Department of Public Safety (DPS) Crime Laboratory, to testify that she "saw" trace amounts of cocaine in the Gas Chromatograph/Mass Spectrometer (GCMS) test results of blood drawn from Appellant Stephanie Lynn Bekendam in an amount that fell below the level that is reportable under DPS standards.

Hawkins's written report of her findings from the GCMS testing on Appellant's blood, attached to this dissenting opinion as Appendix A, does not mention or identify any trace amount of cocaine in Appellant's blood. It states, in pertinent part,

> **Results of Analysis and Interpretation**
> Blood Drugs: Benzoylecgonine (a cocaine metabolite) (1.4 milligrams per liter)

At the gatekeeping hearing, however, Hawkins testified that the GCMS results showed not only the cocaine metabolite Benzoylecgonine in Appellant's blood—in accordance with her written report—but also trace amounts of cocaine in Appellant's blood.[1] Hawkins testified, in part, that after conducting the initial EMIT screening test, she conducted a confirmatory GCMS test:

> Q. Okay. Now, did you also see any trace amounts of cocaine in the sample when you tested it?
>
> . . . .
>
> A. I did see traces of cocaine in the sample, yes.

---

[1]Contrary to the Majority Opinion's assertion, Hawkins never testified that the EMIT detection test showed cocaine in Appellant's blood. She repeatedly testified that the EMIT detection test screened for six classes of drugs, one of those classes being cocaine and/or its metabolites. Blood triggering a positive test in one of the EMIT screening classes must be further tested by the GCMS to determine "which type of analyte [sic], which type of drug, and how much of that drug." Thus, while it is undisputed that Appellant's blood triggered a positive response on the EMIT test in the cocaine and/or cocaine metabolites class, this positive result did not show whether the test was positive because of the presence of cocaine metabolite only or because of the presence of cocaine and cocaine metabolite, nor did it quantify the amount of cocaine and/or cocaine metabolite that triggered the positive response.

2

. . . .

Q. And is it true that in about four hours most of the cocaine in [] someone's system could be metabolized?

A. It can be, yes.

Q. And would it be possible, if you assume a wreck that occurs at 5:30 in the afternoon and a blood draw isn't taken until nearly 7:00 p.m., an hour and a half later, and in that blood draw you see the results that you saw in this case, and you saw trace amounts of cocaine, for there to be cocaine in the bloodstream of the driver at the time of the driving?

A. Yes. Considering -- considering the half-life of cocaine, there may have been significant amounts of cocaine in the blood sample an hour and a half earlier.

. . . .

Q. Now, what exactly is a GCMS? . . . .

A. We perform an extraction from the blood to extract the drugs of interest out of the blood. And then the first part of the instrument separates the compounds of interest or the drugs of interest, and then the second part of the instrument identifies them almost like a fingerprint for that drug.

. . . .

Q. After you've done the extraction and you put the sample in the GCMS, at that time is that when you get the test results that's the basis of your report?

A. Yes.

Q. Or is something -- is there another step?

A. Well, we perform the data analysis.

Q. What is the data analysis?

3

A. The instrument will give me the data for all my controls and my samples. I will do the dialysis on my controls, have that peer reviewed by another coworker, and then I will analyze each case sample individually and provide a result and write my report.

Q. So there's like a computer screen that tells you what's in the sample?

A. There is software for us to look at that separation and that fingerprint that I was speaking of.

Q. And is that where you saw the cocaine metabolite?

A. Yes.

Q. It shows up as a certain bar graph or something on the computer?

A. It does. It shows the peak separation so I can see the drug itself separated, and then it will show the spectrum or what I was referring to that's similar to a fingerprint. And then it -- the software will be used with our calibration to create a concentration.

Q. Now, when you said you saw cocaine or trace of cocaine, it was under the .1 milligrams per liter?

A. It was under the .05 is our cutoff point. .05 is our limit for cocaine.

. . . .

Q. So based on your test report, are you able to testify with any kind of reasonable medical certainty that the driver from whom the sample was drawn was impaired at the time of the accident?

A. I can only say that cocaine may impair an individual person.

. . . .

Q. And that impairment could depend on a number of factors. Correct?

4

A. Yes.

Q. Number of factors that you don't know specifically about this Defendant?

A. Correct.

Q. You don't know . . . whether Stephanie last used drugs one hour before the accident, one day before the accident, three days before the accident?

A. If I had only seen Benzoylecgonine, I may not have known that. But since I saw trace levels of cocaine, I know that it was not long before the time of incident, the time of blood draw, excuse me.

Q. But trace levels of cocaine don't show up in your testing.

A. I saw the cocaine, yes, so I did see the trace levels. It was below my reportable cutoff.

Hawkins later testified in front of the jury, in part, as follows:

Q. And what were the results of your testing on this Defendant's blood?

. . . .

A. My results were 1.4 milligrams per liter of Benzoylecgonine which is a cocaine metabolite.

Q. [] All right. And did your testing also -- did you see any trace amounts of cocaine in the blood that were beneath the reportable levels?

. . . .

A. I did see trace amounts of cocaine, but it was below my reportable limit that I'm allowed to report.

Q. [] Explain to the jury what your reportable limit is.

A. .05 is our lowest calibrator so anything less than half of that I can't even say that I saw cocaine.

5

Q. All right. Now, explain to the jury what Benzoylecgonine is.

A. It's a metabolite of cocaine. Cocaine breaks down -- in order to use a drug, your body will break something down or eliminate it and then it metabolizes.

. . . .

Q. All right. Does -- Benzoylecgonine, that's what is considered an inactive metabolite; is that correct?

A. It is. It is not active on your central nervous system like cocaine is.

Q. So cocaine would be a substance that would or could impair your central nervous system, but the metabolite would not; is that correct?

A. Correct.

Q. All right. Does Benzoylecgonine stay in the system longer than cocaine?

A. It does.

. . . .

Q. And does the fact that you saw trace amounts of cocaine in the Defendant's blood sample, what's the significance of that?

A. The fact that I saw cocaine in the sample and the fact that it metabolizes very quickly means that it may have been significantly higher at the time of the incident.

Q. Does that also mean that the use of the cocaine was closer in time to the time of driving versus being a couple of days beforehand?

A. Yes.

6

Scientific evidence has the ability to mislead a jury that is not properly equipped to judge the probative force of the evidence. *Layton v. State*, 280 S.W.3d 235, 241 (Tex. Crim. App. 2009). The trial court is responsible for determining whether the scientific evidence offered is sufficiently reliable, as well as relevant, to help the jury in reaching accurate results. *Id.* The proponent of scientific evidence bears the burden of proving to the trial court, by clear and convincing evidence, that the evidence is sufficiently relevant and reliable to assist the jury in determining a fact in issue. *Id.* Evidence derived from a scientific theory must meet three criteria in order to be reliable in any given case: "'(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and ([c]) the technique must have been properly applied on the occasion in question.'" *Id.* (quoting *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

Here, as the majority points out, Appellant's argument centers around the third criteria—proper application of the scientific technique on the occasion in question. The majority espouses that "equating of the department's policy with any given scientific technique is erroneous" and then addresses the EMIT and GCMS testing techniques. Maj. Op. @ 8. Thus, the majority distinguishes the failure to follow the DPS policy—which prohibits reporting amounts of cocaine below 0.05mg/L in GCMS testing—from the failure to properly apply the GCMS testing technique at the time of testing. But I see no distinction. Hawkins properly followed DPS standards in her written report and did not report that the

7

GCMS results showed any cocaine in Appellant's blood. Hawkins explained that the DPS prohibited her from reporting that GCMS test results showed cocaine in Appellant's blood because ".05 is our lowest calibrator." Nonetheless at trial, Hawkins was allowed to testify that the GCMS results showed unreportable trace amounts of cocaine in Appellant's blood that were below .05 mg/L and that because cocaine, not just cocaine metabolite, was in Appellant's blood, this proved Appellant used cocaine not long before the blood draw.

If GCMS analysis shows a trace amount of cocaine that is unreportable in a written report by a forensic scientist with the DPS Crime Laboratory per DPS policy because the amount of cocaine is under the lowest calibrated level, how can that amount of cocaine be reportable in verbal testimony at trial by a forensic scientist with the DPS Crime Laboratory when it is still under the lowest calibrated level? If a trace amount of cocaine is too unreliable to be included in a written report, why is it reliable if presented orally? Hawkins's testimony about the trace amount of cocaine was unreliable because it showed that, per DPS policy, application of the technique—GCMS testing—excluded reporting trace amounts of cocaine that fell below the lowest calibrated level of .05 mg/L. And the State presented no other evidence or testimony that GCMS test results of trace amounts of cocaine below the DPS's reportable limits are reliable.

Hawkins's testimony about the trace amounts of cocaine found in Appellant's blood should have been excluded.[2]

I would hold that the trial court abused its discretion by allowing Hawkins to testify that the GCMS testing showed trace amounts of cocaine in Appellant's blood that were below the .05 mg/L reportable cut-off set by DPS policy and would conduct a harm analysis. *See Hernandez v. State*, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003); *Kelly*, 824 S.W.2d at 573. Because the majority does not, I respectfully dissent.

SUE WALKER
JUSTICE

PUBLISH

DELIVERED: March 21, 2013

---

[2]The majority opinion notes the court of criminal appeals' recent opinion of *Somers v. State*, 368 S.W.3d 528 (Tex. Crim. App. 2012). *See* Maj. Op. @ 9. In *Somers*, the court of criminal appeals held that the results of EMIT testing are reliable scientific evidence and are admissible with or without confirmation by GCMS testing. *Id.* at 545. Neither the reliability nor the admissibility of the EMIT test is at issue here. Hawkins testified without objection to the results of the EMIT test on Appellant's blood; Appellant's blood triggered a positive response on the EMIT screening test in the cocaine and/or cocaine metabolites class. The issue here is the reliability of Hawkins's testimony that the GCMS test showed a trace amount of cocaine in Appellant's blood below .05mg/L that was not included in her report of the GCMS analysis of Appellant's blood because it was below the DPS's reportable GCMS cut-off. Thus, *Somers* does not dictate the outcome here.

# APPENDIX A

# TEXAS DEPARTMENT OF PUBLIC SAFETY



CRIME LABORATORY SERVICE MSC 0460
PO BOX 4143
AUSTIN, TEXAS 78765-4143
Voice 512-424-2105    Fax 512-424-2893

**Toxicology Report**
October 10, 2008



STANLEY E. CLARK
DIRECTOR
LAMAR BECKWORTH
ASST. DIRECTOR

COMMISSION
ALLAN B. POLUNSKY, CHAIR
C. TOM CLOWE, JR.
CARIN MARCY BARTH

OFC PAUL HARPER
WICHITA FALLS POLICE DEPT
610 HOLLIDAY ST
WICHITA FALLS, TEXAS 76301

| Laboratory Case Number | Agency Case Number | Offense Date |
|---|---|---|
| L-373318 | 08021973 - | 02/28/08 |

**Suspect(s)**
BEKENDAM, STEPHANIE LYNN DL#    9725

**Offense:** Intoxication Offense
**County of Offense:** Wichita (243)

**Evidence Submitted**
On April 17, 2008 forwarded from DPS MIDLAND LAB by U.S. Mail
Blood specimen from Stephanie Lynn Bekendam

**Results of Analysis and Interpretation**
Blood Drugs:    Benzoylecgonine (a cocaine metabolite) (1.4 milligrams per liter)

Blood analysis: An enzymatic method (EMIT) was used to screen for six classes of drugs: amphetamines, barbiturates, benzodiazepines, cocaine and its metabolites, opiates, and phencyclidine. The EMIT detection cut off for most drugs of interest is 0.1 mg/L in blood. Techniques used for reported toxicology results also include GCMS or LCMS.

The evidence will be returned under separate cover.

Renée Hawkins
Forensic Scientist, Toxicology
Texas DPS Austin Laboratory

Copies will be sent to: DPS Midland Lab (L4M-63565)
DPS Abilene Lab (L4A-61360)

STATE'S
EXHIBIT
24
9/29/10

ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS - LAB ACCREDITATION BOARD
COURTESY - SERVICE - PROTECTION