ACCEPTED
01-15-00182-cr
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/12/2015 2:29:38 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-15-00182-CR

**IN THE COURT OF APPEALS
FIRST JUDICIAL DISTRICT
HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/12/2015 2:29:38 PM
CHRISTOPHER A. PRINE
Clerk

**DAVID ROWE ASHBY,**
Appellant

**V.**

**THE STATE OF TEXAS,**
Appellee

**APPEAL FROM THE COUNTY CRIMINAL COURT AT LAW NO. 6
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 1864067**

**APPELLANT'S BRIEF**

**MATTHEW J. DELUCA**
**State Bar No. 24069601**
**712 Main St., Suite 2450**
**Houston, Texas 77002**
**Tel: (713) 429-4400**
**Fax: (713) 228-2366**
**mattdeluca@gmail.com**

**TYLER FLOOD**
**State Bar No. 24032057**
**1229 Heights Blvd.**
**Houston, Texas 77008**
**Attorneys for Appellant**

**ORAL ARGUMENT REQUESTED**

# IDENTIFICATION OF PARTIES AND COUNSEL

Appellant/Defendant:                    David Rowe Ashby

Appellant's counsel at trial:           Tyler Flood
                                        1229 Heights Blvd.
                                        Houston, Texas 77008


Appellant's counsel on appeal:          Matthew J. DeLuca
                                        712 Main St., Suite 2450
                                        Houston, Texas 77002



Appellee:                               The State of Texas

Appellee's counsel at trial:            Leah Fiedler
                                        Harris County DA's Office
                                        1201 Franklin, Suite 600
                                        Houston, Texas 77002


Appellee's counsel on appeal:           Devon Anderson
                                        Harris County DA's Office
                                        1201 Franklin, Suite 600
                                        Houston, Texas 77002



Trial judge at trial:                   The Honorable James Anderson
                                        County Criminal Court at Law No. 6
                                        Harris County, Texas

# TABLE OF CONTENTS

Identification of Parties and Counsel................................................................i

Table of Contents ................................................................................. ii

Index of Authorities ............................................................................. iii

Statement of the Case................................................................................1

Statement Regarding Oral Argument ........................................................1

Issue Presented................................................................................................2

      1. The trial court erred in denying Appellant's motion to suppress the
traffic stop.

      2. The trial court erred in allowing the State to introduce evidence of a
drug in Appellant's blood specimen.

Statement of Facts......................................................................................2

Summary of the Argument.........................................................................7

Issue Number One – Arguments and Authorities......................................7

Issue Number Two – Arguments and Authorities ....................................11

Prayer ......................................................................................................18

Certificate of Compliance ........................................................................19

Certificate of Service ...............................................................................19

# INDEX OF AUTHORITIES

**Cases**

*Adams v. Williams*................................................................................9
    407 U.S. 143 (1972)

*Bekendam v. State* ...............................................................................13
    441 S.W.3d 295 (Tex. Crim. App. 2014)

*Bekendam v. State* ...............................................................................12
    398 S.W.3d 358 (Tex. App.—Fort Worth 2013), *aff'd*, 441 S.W.3d 295
    (Tex. Crim. App. 2014).

*Brother v. State* ....................................................................................9
    166 S.W.3d 255 (Tex. Crim. App. 2005)

*Carmouche v. State* ..............................................................................8
    10 S.W.3d 232 (Tex. Crim. App. 2000)

*Casey v. State* .....................................................................................12
    215 S.W.3d 870 (Tex. Crim. App. 2007)

*Delarue v. State*...................................................................................15
    102 S.W.3d 388 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)

*Ford v. State*.........................................................................................7
    158 S.W.3d 488 (Tex. Crim. App. 2005)

*Fowler v. State* ....................................................................................10
    266 S.W.3d 498 (Tex. App.—Fort Worth 2009, pet. ref'd)

*Guzman v. State*....................................................................................8
    955 S.W.2d 85 (Tex. Crim. App. 1997)

*Hernandez v. State* ..............................................................................10
    983 S.W.2d 867 (Tex. App.—Austin 1998, pet. ref'd)

*Kelly v. State* ......................................................................................12
    824 S.W.2d 568 (Tex. Crim. App. 1992)

*Kennedy v. State* ..................................................................................................18
      338 S.W.3d 84 (Tex. App.—Austin 2011, no pet.)

*Kraft v. State* .......................................................................................................18
      762 S.W.2d 612 (Tex. Crim. App. 1988)

*Layton v. State* ...................................................................................11,12,14,15
      280 S.W.3d 235 (Tex. Crim. App. 2009)

*Maxwell v. State* ...................................................................................................8
      73 S.W.3d 278 (Tex. Crim. App. 2002)

*McKenna v. State* .................................................................................................18
      780 S.W.2d 797 (Tex. Crim. App. 1989)

*Montgomery v. State* ............................................................................................12
      810 S.W.2d 372 (Tex. Crim. App. 1990)

*State v. Guzman* ...................................................................................................13
      439 S.W.3d 482 (Tex. App.—San Antonio 2014, no pet.)

*Tillman v. State* ...................................................................................................14
      354 S.W.3d 425 (Tex. Crim. App. 2011)

*Weatherred v. State* ........................................................................................11,12
      15 S.W.3d 540 (Tex. Crim. App. 2000)

**Statutes and Rules**

TEX. CODE CRIM. PROC. art. 38.23(a) ....................................................................11

TEX. R. EVID. 402..................................................................................................12

TEX. R. EVID. 403..................................................................................................12

TEX. R. EVID. 702.............................................................................................11,14

TEX. TRANSP. CODE § 545.060(a) .........................................................................10

## STATEMENT OF THE CASE

This is an appeal from a misdemeanor driving while intoxicated conviction. Appellant was charged by information in cause number 1864067 with driving while intoxicated, alleged to have occurred on November 24, 2012. (CR 7). On February 4, 2015, after a jury was empaneled and sworn, Appellant pled "not guilty" to the charged offense. (1 RR 4). On February 5, 2015, after the trial court denied Appellant's objection to the admission of evidence, he changed his plea to "guilty" to the charged offense. (CR 104-05) (2 RR 70-71). The trial court assessed punishment at 180 days Harris County Jail, probated for one year, and a $1000 fine. (CR 106). On the same day, the trial court certified Appellant's right to appeal. (CR 103). On February 12, 2015, Appellant timely filed a notice of appeal. (CR 90, 92).

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests an opportunity for oral argument to be heard in this case. Because the appeal deals with both a reasonable suspicion/probable cause determination and the admission of scientific evidence, it requires this Court to analyze both the facts and the law applied, so the specific facts in this case and application of the law to those facts are crucial. Appellant believes that oral argument would assist this Court in its analysis and decision.

1

## ISSUES PRESENTED

### Issue Number One

The trial court erred in denying Appellant's motion to suppress the traffic stop.

### Issue Number Two

The trial court erred in allowing the State to introduce evidence of a drug in Appellant's blood specimen.

## STATEMENT OF FACTS

On November 24, 2012, at approximately 7:40 a.m., Deputy Tyler Gossett was dispatched to a report of a black SUV that struck a wall while driving northbound on the toll bridge that crossed the ship channel.[1] The dispatch advised Deputy Gossett that the vehicle had stopped at a toll plaza. Deputy Gossett made a U-turn and observed a black SUV leaving the toll plaza. (1 RR 15-16). He then positioned his patrol car behind the black SUV, but did not immediately pull it over.[2] (1 RR 17). Deputy Gossett followed the black SUV from the toll road onto the connector ramp and eventually westbound onto Interstate 10. (1 RR 18); *See* State's Exhibit 3. He observed the vehicle weaving within its lane, and as they traveled over the connector ramp, it got close to the shoulder line. On the

---

[1] Deputy Gossett did not know who called in the report and did not know the make or model of the reported black SUV. (1 RR 53-54).
[2] Deputy Gossett testified "At this point I haven't seen the vehicle do anything…Before I come into contact with anybody, I want to make sure that I have reason to come into contact with somebody." (1 RR 17).

Interstate 10 main lines, the vehicle straddled the lane line and crossed over into another lane, so Deputy Gossett activated his emergency equipment and conducted a traffic stop on the black SUV. (1 RR 18).

When Deputy Gossett made contact with the driver, he identified himself as Appellant. (1 RR 19). Deputy Gossett observed that Appellant was wearing a gray sweater that appeared to have been soiled. He believed he smelled an odor of alcohol on Appellant. (1 RR 20). He described Appellant's eyes as "glassy" and observed Appellant to make slow, deliberate movements while getting his driver's license out of his wallet. (1 RR 21). Deputy Gossett attempted to administer the Horizontal Gaze Nystagmus test on Appellant and observed a lack of smooth pursuit in his eyes, but Appellant was unable to perform the complete test as instructed, and appeared as if he was falling asleep. (1 RR 32-33, 34). Appellant performed "poorly" on the Walk and Turn Test and could not get past the instruction phase. (1 RR 36-37). Deputy Gossett observed Appellant to sway, use his arms for balance, and put his foot down during the One Leg Stand Test. (1 RR 40). Appellant told Deputy Gossett that he had been awake all night, and Deputy Gossett acknowledged at trial that sleep deprivation could affect performance on coordination tests. (1 RR 25, 59).

At that point, Deputy Gossett determined that Appellant did not have his normal mental and physical faculties about him and he was placed under arrest for

driving while intoxicated. (1 RR 42). Appellant agreed to provide a specimen of his blood. (1 RR 45). Deputy Gossett transported Appellant to Bayshore Medical Center where Phadrae White, a phlebotomist, obtained a blood specimen from Appellant. (1 RR 48, 2 RR 5,7). She used gray-top tubes to draw the blood, which she testified are specifically used when testing blood for alcohol. Had she been drawing blood for drug analysis she stated she would have used something other than a gray-top tube. (2 RR 11).

Dr. Chen, a toxicologist at the Harris County Institute of Forensic Sciences, analyzed Appellant's blood specimen for one controlled substance, referred to throughout his testimony as T.F.M.P.P.[3] (2 RR 14, 25-26). Dr. Chen described the process in which he tested the blood specimen as liquid chromatography tandem mass. In his explanation of how the testing process worked, he used testing for cocaine as an example, not T.F.M.P.P.[4] He testified that this technique was generally accepted in his field, had been previously tested in the lab, and was generally accepted within the relevant scientific community. (2 RR 23-25). He reported that T.F.M.P.P. was present in Appellant's blood, but did not quantify the

_____

[3] Dr. Chen testified that T.F.M.P.P. was another name for Trifluoromethylphenylpiperazine, a designer amphetamine drug. (2 RR 33).
[4] Though there was testimony and discussion with the trial court about cocaine, there was no testimony presented as to whether the lab analyzed Appellant's blood specimen for cocaine. The analysis testimony focused on T.F.M.P.P. (2 RR 26).

4

amount present.[5] And without quantification, Dr. Chen could not determine time of ingestion or the effect it would have had on Appellant, though he repeatedly stated that the drug was "against the law." (2 RR 26-27, 33-34).

Dr. Valentine, Appellant's expert witness, testified that T.F.M.P.P. was a "sympathomimetic drug," a stimulant with similar action to amphetamine or cocaine. (2 RR 45-46). The studies on T.F.M.P.P. were "very meager" so little was known about its absorption, distribution, and secretion in humans, and there was no way to tell the time of ingestion of the T.F.M.P.P. without knowing a quantitative value. (2 RR 42). After viewing the scene video, Dr. Valentine determined that Appellant displayed signs similar to that of a person under the influence of alcohol or suffering from sleep deprivation, but not a sympathomimetic drug like T.F.M.P.P. (2 RR 46-47). Using Defendant's Exhibit 7, a chart normally used by officers to categorize drugs by certain indicators, Dr. Valentine testified that T.F.M.P.P. would most closely align with a CNS stimulant. But based on that chart, Appellant displayed no indicators consistent with being under the influence of a CNS stimulant. (2 RR 50-51).

Dr. Walterscheid, co-director of toxicology at the Harris County Institute of Forensic Sciences, testified that T.F.M.P.P. had similar properties to cocaine, methamphetamine, and ecstasy, which could produce a psychedelic-like euphoria.

---

[5] Despite Dr. Chen's testimony that the results were not quantified, he stated that the testing instrument could "be accurate to the decimal." (2 RR 23).

5

And with stimulants, one would usually first see excitability and then drowsiness after the drug's release. Dr. Walterscheid stated "That's why these drugs are unsafe. That's why we consider them illegal because there's no medical benefit and they just cause trouble." (2 RR 53, 56-57). But he acknowledged that T.F.M.P.P. had not been studied in humans because it was "kind of new" and "probably just not safe enough" to test on humans. (2 RR 54). The drug had only been tested on mice or "cells from mice." (2 RR 56). He knew nothing about absorption or elimination rates for T.F.M.P.P. and could not determine when Appellant had ingested it. (2 RR 61, 63). When asked whether the T.F.M.P.P. could have been quantified, he admitted that his lab had the proper standards to quantify the T.F.M.P.P. present in Appellant's blood specimen, but it would have required "a lot of extra effort." And he believed that quantification would have made no difference because T.F.M.P.P.'s exact toxic amount was unknown.[6] (2 RR 57). He also acknowledged there was "no way" he could reliably extrapolate to tell if the T.F.M.P.P. was psychoactive in Appellant at the time of driving. (2 RR 62).

---

[6] Despite this unknown, Dr. Walterscheid concluded that one should not have T.F.M.P.P. in their system "at all." (2 RR 57).

6

## SUMMARY OF THE ARGUMENT

The trial court erred in denying Appellant's motion to suppress the traffic stop. The arresting officer did not have reasonable suspicion or probable cause to legally detain Appellant. He acknowledged in trial that he followed Appellant in an attempt to gain probable cause to stop. However, based on his testimony and the scene video, Appellant never actually committed a traffic violation that would have allowed the officer to legally stop the vehicle. Because the officer did not have reasonable suspicion or probable cause to stop Appellant, all evidence obtained as a result of the illegal stop should have been suppressed. Additionally, the trial court erred in allowing the State to introduce evidence of a drug called T.F.M.P.P. in Appellant's blood. The State failed to present adequate evidence during the Rule 702 hearing to show that the evidence was both relevant and reliable to present to a jury.

## ISSUE NUMBER ONE

The trial court erred in denying Appellant's motion to suppress the traffic stop.

## ARGUMENTS AND AUTHORITIES

Appellant contends that the State did not present evidence to adequately show Deputy Gossett had reasonable suspicion or probable cause to stop Appellant. An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law. *Ford v.*

7

*State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that an individual is, has been, or is about to be engaged in criminal activity. *Id*.

### Standard of Review

This Court should review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing the court's application of the law *de novo*. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). The trial court is the sole judge of the credibility of the witnesses and their testimony. *Id*. But this Court should review the trial court's application of the relevant Fourth Amendment standards. *Carmouche v. State*, 10 S.W.3d 232, 237 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997)).

### Deputy Gossett did not have reasonable suspicion or probable cause to stop Appellant

Deputy Gossett did not have reasonable suspicion or probable cause to stop Appellant based solely on the anonymous report he had received. The report simply stated that a "black SUV" had struck a wall. He had no description of the driver or license plate number. (1 RR 55-56). The factual basis for an officer to stop a vehicle may be supplied by information acquired from another person, rather

8

than the officer's personal observation. *Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). And a stop based on facts supplied by a citizen does not run afoul of the Fourth Amendment, so long as the officer adequately corroborates those facts. *Id*. at 259. But Deputy Gossett acknowledged at trial that he did not have a legal reason to stop Appellant's vehicle when he first came into contact with it. He testified that he did not immediately pull the vehicle over because he hadn't "seen the vehicle do anything" and he wanted to make sure he had a reason to stop Appellant. (1 RR 17). He later testified that as he followed Appellant, he was "focused on the vehicle, trying to obtain probable cause…to make contact with the vehicle." (1 RR 56). These admissions show that Deputy Gossett did not believe he had reasonable suspicion or probable cause to stop Appellant when he started following him on the toll road. He eventually stops Appellant's vehicle after following it for some time, but, based on Deputy Gossett's testimony combined with the actual scene video, there was no evidence presented to show that Appellant actually committed any traffic violation.

Deputy Gossett stated that first Appellant weaved within his lane, prior to entering the connector ramp, then came close to the fog line while on the connector ramp. (1 RR 18). This portion of Appellant's driving is visible on the scene video. *See* State's Exhibit 3. Indeed, the video shows Appellant move toward the right

9

fog line – but never crosses it – and then move toward the left yellow line without crossing over it. These actions do not constitute traffic violations. Once Appellant's vehicle entered the main freeway, Deputy Gossett testified that Appellant "straddles the lane line crossing over into another lane." (1 RR 18). The video showed some weaving within the lane and the left tire crossing over into an adjacent lane briefly a couple of times. However, the scene video showed no other vehicles in close proximity to Appellant in either lane and no vehicle had to take any evasive action to avoid Appellant.

The State presented no evidence that Appellant's failure to stay in a single marked lane was unsafe, so reasonable suspicion did not exist to stop Appellant for such a traffic violation. *See* TEX. TRANSP. CODE § 545.060(a); *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex. App.—Austin 1998, pet. ref'd) ("A violation of section 545.060 occurs only when a vehicle fails to stay within its lane and such movement is not safe or is not made safely." ); *Fowler v. State*, 266 S.W.3d 498, 502 (Tex. App.—Fort Worth 2009, pet. ref'd) (section 545.060 creates a single offense: "moving out of a marked lane when it is not safe to do so.").

The trial court erred in denying Appellant's motion to suppress the stop based on a lack of reasonable suspicion or probable cause. Because Deputy Gossett did not have reasonable suspicion or probable cause to stop Appellant, all

evidence obtained after and as a result of the illegal stop should have been suppressed. TEX. CODE CRIM. PROC. art. 38.23(a).

## ISSUE NUMBER TWO

The trial court erred in allowing the State to introduce evidence of a drug in Appellant's blood specimen.

## ARGUMENTS AND AUTHORITIES

At trial, the State sought to admit, over Appellant's objection, evidence of a substance in Appellant's blood, specifically a synthetic drug referred to as T.F.M.P.P. (2 RR 19). Outside the presence of the jury, the trial court held a Rule 702 hearing in which testimony was heard from two State's witnesses, Dr. Chen and Dr. Walterscheid, and one Appellant's witness, Dr. Valentine. *See* TEX. R. EVID. 702. At the end of the hearing, the trial court determined that it would allow the jury to hear evidence of Appellant's blood test results, and specifically the T.F.M.P.P. in Appellants blood. (2 RR 70). Appellant contends that the State's evidence was not sufficiently relevant and reliable to assist the jury in determining a fact in issue and should have been inadmissible under Texas Rules of Evidence 402, 403, and 702.

### *Standard of Review*

This Court reviews a trial court's ruling on the admission of evidence, including expert testimony, for an abuse of discretion. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.

11

Crim. App. 2000). This Court should reverse the trial court's decision if it lies outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

Irrelevant evidence is not admissible in trial. TEX. R. EVID. 402. And the trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of confusing the issues or misleading the jury. TEX. R. EVID. 403. Scientific evidence has the ability to mislead a jury that is not properly equipped to judge the probative force of the evidence. *Layton*, 280 S.W.3d. at 235; *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). Pursuant to Rule 702, it is the responsibility of the trial court to determine whether the scientific evidence offered is sufficiently reliable, as well as relevant, to help the jury in reaching accurate results. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). This puts the trial court in the role of "gatekeeper" in order to weed out inadmissible evidence based on a lack of reliability. The trial court may exclude scientific testimony or evidence that is not reliable. *Bekendam v. State*, 398 S.W.3d 358, 362 (Tex. App.—Fort Worth 2013), *aff'd*, 441 S.W.3d 295 (Tex. Crim. App. 2014). To be considered reliable, the State must satisfy three criteria (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573.

***The State did not show that Dr. Chen's testimony satisfied the Kelly requirements.***

The State did not present sufficient evidence under *Kelly* to show that the technique of testing Appellant's blood was applied properly as it related to T.F.M.P.P. Before Dr. Chen even took the stand, the phlebotomist testified that she used a type of vial to draw Appellant's blood that was specifically used to test for alcohol and that a different type of vial should have been used to test the sample for drugs. (2 RR 11). Dr. Chen's testimony as to how he tested Appellant's blood was extremely brief. He explained how the testing process worked for analyzing cocaine, but never explained how it analyzed for the drug in question, T.F.M.P.P. When asked about how he analyzed Appellant's blood for T.F.M.P.P., Dr. Chen simply stated that he followed protocol. (2 RR 26). He acknowledged that he wasn't qualified to testify as to the effects the drug would have had on Appellant. (2 RR 32). Conversely, in *Bekendam v. State*, 441 S.W.3d 295, 297 (Tex. Crim. App. 2014), the Court of Criminal Appeals affirmed the lower court's decision that an analyst's testimony satisfied the third *Kelly* prong when the analyst could quantify the substance and could testify to the substance's half-life. And with respect to blood tests, the expert who must satisfy the Rule 702 criteria is the analyst who tests the blood sample. *State v. Guzman*, 439 S.W.3d 482, 488 (Tex. App.—San Antonio 2014, no pet.). Dr. Chen's testimony simply

did not rise to the level to satisfy Rule 702 or *Kelly*. The trial court should have excluded this unreliable evidence.

***The State did not show that Dr. Walterscheid was qualified to give an opinion as it related to T.F.M.P.P.***

Under Texas Rule of Evidence 702, if a witness possesses scientific, technical, or other specialized knowledge that will assist a fact-finder and is qualified as an expert by knowledge, skill, experience, training, or education, then that expert may offer expert opinion testimony. TEX. R. EVID. 702. For expert testimony to be admissible under this rule, the State must demonstrate, by clear and convincing evidence, that the testimony "is sufficiently reliable and relevant to help the jury in reach accurate results." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

The only witnesses the State presented to try to explain the relationship of the T.F.M.P.P. with the effect on Appellant was Dr. Walterscheid. It is critical that there be a direct or logical connection between the actual evidence and the proposition sought to be proved. *Layton*, 280 S.W.3d at 240. Yet Dr. Walterscheid showed little specific knowledge or expertise as to T.F.M.P.P. He acknowledged that the drug had not been tested in humans, and he knew nothing about its absorption or elimination rates, so he could not determine when Appellant would have ingested it. Above all, he did not know the toxicity level of the drug and admitted that there was "no way" he could reliably extrapolate to determine

14

whether the drug was psychoactive at the time Appellant was driving. Failure to extrapolate the presence of a controlled substance back to the time of driving can render the evidence insufficient under a Rule 403 analysis. *Delarue v. State*, 102 S.W.3d 388, 401 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). The *Delarue* court determined that evidence of a controlled substance in a person's body was inadmissible when no attempt was made to quantify, no attempt was made to show when the drug was introduced into the person's system, no attempt was made to show the person was under the influence of the drug at the time of the accident, and no attempt was made to show causation. *Id*. Here, Dr. Walterscheid admitted that his lab could have attempted to quantify the level of T.F.M.P.P. found in Appellant's blood, but that it would have required extra effort. That response should not be acceptable when determining the admissibility of scientific evidence in a criminal trial. Like in *Delarue*, without a better understanding here of the relationship between T.F.M.P.P. and how it works in the human body, Dr. Walterscheid's testimony was not sufficiently relevant and reliable to assist the jury under Texas Rules of Evidence 402, 403, and 702.

In *Layton*, the Court of Criminal Appeals held that without evidence the level of dosage, exact times of ingestion, or the half-life of the drug in the human body, the usage of a particular drug was not relevant to a person's intoxication. *Layton*, 280 S.W.3d at 241-42. Though the State considered Dr. Walterscheid an

"expert witness," he could not testify to dosage, ingestion, or the half-life of the drug. His testimony as it related to T.F.M.P.P. lacked the necessary knowledge to be considered relevant to Appellant's intoxication.

It should not be overlooked that both Dr. Chen and Dr. Walterscheid seemed to conclude that because T.F.M.P.P. was illegal, if Appellant ingested it, he was intoxicated. Dr. Chen stated that the drug was "against the law" and "just cannot be there" and Dr. Walterscheid concluded that "you shouldn't have it at all." (2 RR 33-34, 57). These conclusions are dangerous because of the clear lack of information either witness had about T.F.M.P.P. And these conclusions are telling as to the confusion of the issue and the lack of reliability in their testimony. The legality of possessing or ingesting T.F.M.P.P. was not an element of the DWI charge against Appellant. This sort of testimony would confuse and mislead the jury into believing that any positive amount of T.F.M.P.P. in Appellant's blood would automatically render him intoxicated at the time of driving, and thus guilty of the charged offense.

The trial court's reasoning for allowing the evidence of T.F.M.P.P. was also flawed. The trial court stated:

> TRIAL COURT: It begs the question that if you mix up some state of the art designer drug with anything from ethanol to cocaine to Benzos, we can probably never say "I'm going to get a set response from an individual" because the options are innumerable up there. Then we tell the public, as long as you mix up some really good new stuff that messes you up and makes you a danger on the freeway, the laws can't

16

figure out how detailed your witches' brew is, go ahead and drive your car because we can't quite figure out the pharmacology of the mixture.

DEFENSE COUNSEL: That's what the law requires.

TRIAL COURT: And I get that.

DEFENSE COUNSEL: We can't jump and speculate. We can't do that.

TRIAL COURT: If it wasn't for the videotape, I'd be with you; but I've got a guy who's literally staggering around, whose driving is breathtaking to say the least. I'm surprised he didn't get killed stepping out of the car. Chain of evidence, I'm good on. I'm going to let the jury hear about [Appellant's] witches' brew[.]

(2 RR 69-70). The trial court made the assumption that because Appellant's driving and balance were poor, he must have been intoxicated on something. But because State failed to show with any amount of reliability that the T.F.M.P.P. actually intoxicated Appellant, it failed in satisfying *Kelly* and Rule 702 and the trial court should have excluded the evidence.

The trial court erred in allowing the evidence of T.F.M.P.P. in Appellant's blood specimen to be introduced to the jury. This error is reversible. Because the particular evidence would have been used to inculpate Appellant during trial, this Court should presume the trial court's erroneous denial of the motion to suppress

17

influenced Appellant's decision to plead guilty.[7]  The judgment of the trial court should be reversed.

## PRAYER

Appellant prays that this Court sustain his points of error, reverse the judgment of conviction, reverse the trial court's order, and remand the case to the trial court for further proceedings consistent with this Court's ruling.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Matthew J. DeLuca
Matthew J. DeLuca
State Bar No. 24069601
712 Main St., Suite 2450
Houston, Texas 77002
Tel: (713) 429-4400
Fax: (713) 228-2366
mattdeluca@gmail.com

Tyler Flood
State Bar No. 24032057
1229 Heights Blvd.
Houston, Texas 77008

Attorneys for Appellant

</div>

---

[7] If the evidence that should have been suppressed would in any measure inculpate the accused, a reviewing court may presume that the denial of the motion to suppress influenced the defendant's decision to plead guilty. *Kennedy v. State*, 338 S.W.3d 84, 102 (Tex. App.—Austin 2011, no pet.) (citing *McKenna v. State*, 780 S.W.2d 797, 799-80 (Tex. Crim. App. 1989); *Kraft v. State*, 762 S.W.2d 612, 615 (Tex. Crim. App. 1988)).

18

**CERTIFICATE OF COMPLIANCE**

I certify that this brief was prepared with Microsoft Word, and that, according to the program's word-count function, the sections covered by Texas Rule of Appellate Procedure 9.4(i)(1) contain 4,381 words.

/s/ Matthew J. DeLuca
Matthew J. DeLuca

**CERTIFICATE OF SERVICE**

I certify that a copy of this brief was served on Alan Curry, Harris County District Attorney's Office, Appellate Division, by electronic filing and service on October 12, 2015.

/s/ Matthew J. DeLuca
Matthew J. DeLuca